# EXHIBIT 1

# TANKER TIME CHARTER PARTY

**Vessel Name: Barge "*B NO. 240*" and Tug "*BARBARA E. BOUCHARD*"**

**Date: *March 27, 2019***

# ExxonMobil Time 2012

## *Table of Contents*

1 Term ..................................................................................................6
   a Firm Period ......................................................................................6
   b Optional Period(s)............................................................................6
      (1) First Optional Period ..............................................................6
      (2) Second Optional Period .........................................................6
   c Off-Hire Extensions..........................................................................6

2 Vessel Particulars ................................................................................7

3 Hire ...................................................................................................8
   a Payment of Hire ...............................................................................8
      (1) Hire Rate for Firm Period ........................................................8
      (2) Hire Rate for Optional Period(s)..............................................8
         (a) First Optional Period ..........................................................8
         (b) Second Optional Period .....................................................8
      (3) Hire Rate for Off-Hire Extensions...........................................8
   b Deductions .......................................................................................8
   c Final Voyage....................................................................................9
      (1) Use of the Vessel ...................................................................9
      (2) Hire payment ..........................................................................9
   d Loss of Vessel .................................................................................9
   e Reduction in Hire .............................................................................9
   f Default............................................................................................10
   g Extra Expenses and Advances......................................................10
   h Hourly Rate of Hire .......................................................................10
   i Taxes ............................................................................................10

4 Owner's Warranties ...........................................................................11
   a Vessel Condition ...........................................................................11
   b Vessel Management and Operation ...............................................11
   c Evaporator ....................................................................................11
   d Stability and Structural Integrity.....................................................11
   e Cargo Heating ...............................................................................11
   f Cargo Manifolds.............................................................................12
   g Communications ............................................................................12
   h Crew Complement .........................................................................12
   i Drug and Alcohol Policy.................................................................12
   j Compliance ...................................................................................13
   k Charterer's Representatives ..........................................................13
   l Quality Assurance .........................................................................13
      (1) Regarding the Vessel.............................................................13
      (2) Regarding the Operator .........................................................14
   m Security .........................................................................................14

5 Delivery............................................................................................15
   a Place of Delivery ...........................................................................15
   b Laydays
      ...................................................................................................**Err**
      **or! Bookmark not defined.**
   c Fuel at Delivery .............................................................................16
   d Space Available to Charterer.........................................................16

6 Trading Limits ...................................................................................16
   a Trading Range ...............................................................................16
   b Berths and Lightering.....................................................................16

    c  Vessel Speed Orders............................................................................................17
    d  Controlled Passages...........................................................................................17
    e  Ship Inspection Report (SIRE) Program............................................................17

7   Dry Cargoes ...........................................................................................................17

8   Speed, Fuel and Pumping Warranties ....................................................................17
    a  Speed Performance Warranty ...........................................................................17
    b  Fuel Consumption Warranty ..............................................................................18
       (1)  Propulsion and Auxiliary Fuel......................................................................18
       (2)  Heating and Tank Cleaning Fuel..................................................................19
       (3)  Fuel Consumption in Port.............................................................................19
           (a)  When not within an IMO MARPOL Annex VI Emission Control Area .................19
           (b)  When within an IMO MARPOL Annex VI Emission Control Area ......................19
    c  Pumping Performance Warranty .......................................................................19

9   Performance Reviews .............................................................................................20
    a  Performance Review Frequency and Compensation..........................................20
       (1)  Speed Warranty Compensation ..................................................................20
       (2)  Fuel Performance Warranty Compensation..................................................20
       (3)  Pumping Performance Warranty Compensation ..........................................20
       (4)  Performance Review Basis ..........................................................................21
       (5)  Performance Claims Review .......................................................................21
       (6)  Claim for Final Period..................................................................................21
    b  Performance Review Calculations......................................................................21
       (1)  Speed Warranty Calculations......................................................................21
           (a)  Speed Warranty Adjustments.................................................................21
           (b)  Speed Warranty Calculation Method.......................................................22
       (2)  Fuel Warranty Calculations.........................................................................22
           (a)  Average Speed ......................................................................................22
           (b)  Days at Sea ...........................................................................................23
           (c)  Warranted Consumption ........................................................................23
           (d)  Allowed Consumption ............................................................................23
           (e)  Amount Due Charterer............................................................................23
       (3)  Pumping Warranty Calculations...................................................................24
           (a)  Warranty Pumping Time .........................................................................24
           (b)  Crude Oil Washing ("COW") Allowance ..................................................24
           (c)  Charter Party Pumping Hours .................................................................24
           (d)  Actual Pumping Hours ............................................................................24
           (e)  Hours Lost .............................................................................................24
           (f)  Compensation Due Charterer .................................................................24
           (g)  Waiver of Compensation Due Charterer .................................................24
       (4)  In-Port Fuel Warranty Calculations..............................................................24
           (a)  Warranty In-Port Time ...........................................................................24
           (b)  Idle Consumption Allowance ..................................................................24
           (c)  Loading Allowance..................................................................................24
           (d)  Discharging Allowance ...........................................................................25
           (e)  Allowed Consumption ............................................................................25
           (f)  Amount Due Charterer............................................................................25

10  Liens ......................................................................................................................25

11  Off-Hire ..................................................................................................................25
    a  General Provisions ............................................................................................25
    b  Cumulative Off-Hire ..........................................................................................26
    c  Detention of the Vessel......................................................................................26
    d  Owner's Due Diligence ......................................................................................27

*B NO. 240 and M/V BARBARA E. BOUCHARD* Time Charter dated *[ March 27, 2019]*

    e  Trading While Off-Hire .................................................................27
    f  Reservation ..................................................................................27

12  Dry-docking and Repairs .................................................................27
    a  General Provisions ......................................................................27
    b  Adjustment of Hire ......................................................................27
    c  Accumulation of Off-Hire Time ..................................................27
    d  Dry-docking Area ........................................................................27
    e  Notices ........................................................................................28

13  Owner Provides ...............................................................................28
    a  Owner's Responsibility ...............................................................28
    b  Wages, Provisions and Stores ...................................................28
    c  Lubricants ...................................................................................28

14  Officers' Duties ...............................................................................28
    a  Master's Duties ..........................................................................28
    b  Logs ............................................................................................28
    c  Conduct ......................................................................................29

15  Fuel, Port Charges, Etc. ..................................................................29
    a  Fuel, Port Charges, Dues and Fees ..........................................29
    b  Tugs and Pilots ..........................................................................29
    c  Charterer's Responsibility ..........................................................29
    d  Charterer's Tugs or Pilots ..........................................................30
    e  Exception ....................................................................................30

16  Additional Equipment ......................................................................30

17  Lay-up ..............................................................................................30

18  Requisition of Vessel ......................................................................30
    a  Requisition of Title ......................................................................30
    b  Other Requisition .......................................................................30

19  Redelivery ........................................................................................31
    a  Redelivery Conditions ................................................................31
    b  Fuel at Redelivery ......................................................................31
    c  Early Redelivery .........................................................................31

20  Bills of Lading .................................................................................31
    a  Signatures ..................................................................................31
    b  Carriage of Cargo ......................................................................31
        (1)  Clause Paramount ............................................................31
        (2)  Jason Clause .....................................................................32
        (3)  General Average ...............................................................32
        (4)  Both to Blame ...................................................................33
        (5)  Limitation of Liability .........................................................33
        (6)  Deviation Clause ...............................................................33
    c  Bill of Lading Indemnity ..............................................................33
    d  Form of Indemnity ......................................................................33
    e  Indemnity Terms and Conditions ...............................................34
        (1)  Nature of Indemnity ..........................................................34
        (2)  Funds for Defense ............................................................34
        (3)  Arrest or Detention ...........................................................34
        (4)  Termination of Indemnity ..................................................34
        (5)  Governing Law ..................................................................35
    f  Arbitration of Bill of Lading Claims .............................................35

21  War Risks .........................................................................................35

*B NO. 240 and M/V BARBARA E. BOUCHARD* Time Charter dated *[ March 27, 2019]*

        a  Contraband ........................................................................................35
        b  War Zones .........................................................................................35
        c  War Risks Insurance..........................................................................35
        d  Additional Costs ................................................................................36
        e  Hostile Areas ....................................................................................36

22  Exceptions .................................................................................................36
        a  Loss, Damage, Delay ........................................................................36
        b  Number of Grades .............................................................................37
        c  Limitation of Exceptions .....................................................................37

23  Salvage ......................................................................................................37

24  ITOPF .........................................................................................................37

25  Clean Seas .................................................................................................37
        a  Retention of Residues .......................................................................37
        b  Tank Washings ..................................................................................37
        c  Disposition of Residues .....................................................................38
        d  Additional Pollution Prevention Measures .........................................38

26  Cargo Measurement ..................................................................................38
        a  Measurement and Sampling Requirements .......................................38
        b  Loading Requirements........................................................................38
        c  Letter of Protest .................................................................................38
        d  Discharging Requirements .................................................................39
        e  Inspection ..........................................................................................39

27  Insurance Costs and Liability Levels ........................................................39
        a  Insurance Required ............................................................................39
        b  Liability Coverage ..............................................................................39
        c  Surcharge Costs ................................................................................39
        d  Increased Costs .................................................................................40
        e  Negotiation of Increased Costs .........................................................40
        f  Notice to Charterer ............................................................................40
        g  Lapse of Coverage(s) ........................................................................40
        h  TOPIA / STOPIA 2006........................................................................41
        i  Certificate(s) of Financial Responsibility............................................41

28  Parent Guaranty and Change of Ownership ..............................................41
        a  Parent Guaranty .................................................................................41
        b  Restrictions on Transfer .....................................................................41

29  Arbitration ..................................................................................................41

30  Assignment and Sublet...............................................................................42

31  Business Policy...........................................................................................42

32  Interpretation and Law ...............................................................................42

Schedule A — Warranted Description of Vessel .................................................44

Schedule B — Form of Parent Guaranty .............................................................70

Schedule C  — TMSA Element Levels .................................................................71

*IT IS THIS [ Wednesday March 27th ] DAY of [2019] MUTUALLY AGREED* between *Bouchard Transportation Co., Inc.*, a company organized under the laws of *New York* and having its head office at *58 South Service Road, suite 150, Melville, NY 11747*, as owner ("**Owner**") of the *Barge "B NO. 240" and Tug "BARBARA E. BOUCHARD"*, as more fully described and warranted herein ("**Vessel**"), and *Novum Energy Trading Inc.*, a company organized under the laws of *Delaware* and having its head office at *3200 Kirby Drive, suite 1000, Houston, Tx 77098*, as charterer ("**Charterer**"), that Owner lets and Charterer hires the use and services of the Vessel for the carriage of *Clean Petroleum Products maximum 4 grades within Vesssel's natrual segregations, unleaded, undarker than 2.5 NPA, bio-diesel blend max 24.99% bio-mas content, gasoline/mtbe blend excluding casing heads, solvents and chemicals*, in bulk, and such other lawful merchandise as may be suitable for a vessel of her description, for the term and on the terms and conditions hereinafter set forth in this time charter party ("**Charter**").

## 1    Term

**a   Firm Period**

The term of the Charter shall be for a period of *Six (6) Months* ("**Firm Period**") plus any extensions thereof as provided in Clause 1b and Clause 1c. ~~The Firm Period shall commence at the time when the Vessel is placed at Charterer's disposal as provided in Clause 5. The word "about," as used in Clause 1a, shall mean up to forty-five (45) days more or less, at Charterer's option, and shall apply to the term of the Charter consisting of the Firm Period plus any optional periods or extensions as provided in Clause 1b and/or Clause 1c.~~ The term of the Charter, as stipulated in Clause 1a, shall hereinafter be referred to as ("**Charter Term**").

**b   Optional Period(s)**

Charterer shall have the option of extending the term of the Charter for additional period(s) ("**Optional Period(s)**") by written notice to Owner as follows:

~~*[Insert the description of the optional period(s), if any. For example:*~~

~~*"There are no Optional Periods under the Charter.", or*~~

**(1) First Optional Period**

*One, Six (6) Month, to be declared not less than Sixty (60) days prior to the expiration of the Firm Period.*

**(2) Second Optional Period**

*One,Six (6) Month, to be declared not less than Sixty (60) days prior to the expiration of the first Optional Period.*

~~**c   Off-Hire Extensions**~~

~~The term of the Charter may also be extended by Charterer for periods of all, or any part, of the time the Vessel is off-hire during the Firm Period and/or Optional Period(s) (**"Off-Hire Extension(s)"**) by giving written notice to Owner at least thirty (30) days before the expiration of the Firm Period or the Optional Period, as the case may be. *Hire rate to apply for any such extension shall be that in effect at the time of off-hire.* If Charterer so elects, and gives a further written notice to Owner at least fifteen (15) days before the expiration of any such Off-Hire Extension, all or any part of the time the Vessel is off-hire following the previous notice shall be added to the term of the Charter. The term "off-hire", as used in Clause 1c and elsewhere in the Charter, shall include any period(s) as specified in Clause 11, as well as any other period(s) for which cesser or suspension of hire is otherwise provided for in the Charter, or which stipulated in the Charter to be for Vessel's or Owner's time and/or account.~~

34    **2    Vessel Particulars**

35    ~~The Vessel to be hired for services under the Charter is designated as Hull Number [insert] to be built~~
36    ~~for Owner in [insert] Shipyard ("Shipyard") by [insert] of [insert] ("Builder").~~  Owner warrants that, as of
37    the date and time of Vessel delivery hereunder and during the Charter Term, the Vessel and its
38    equipment will have the particulars, capabilities, and capacities as shown in Schedule A hereto
39    (**"Schedule A"**).  Should there be any conflict between the particulars, capabilities, and capacities
40    shown in ~~0~~ **Questionnaire 88** and any other provision within a Clause of the Charter, the particulars,
41    capabilities, and capacities as specified in the Clause of the Charter shall prevail to the extent of the
42    conflict.

43    ~~**a    Monitoring**~~

44    ~~The Building Contract shall include a right, which Owner shall exercise, for Owner to send~~
45    ~~supervisors on-site at the Shipyard and such other locations where components of the Vessel are~~
46    ~~fabricated, or tests or trials held; and such supervisors shall cooperate, before and at the time of~~
47    ~~delivery under the Building Contract, with Charterer and Charterer's representatives with a view~~
48    ~~to ensuring that Builder fulfills its obligations under the Building Contract.  The Building Contract~~
49    ~~shall contain a provision giving Charterer's representatives a continuing right to be resident on~~
50    ~~site at the Shipyard, at Charterer's risk and expense, and to monitor the Vessel's construction~~
51    ~~progress, with access to the construction and fabricating facilities of Builder and its~~
52    ~~subcontractors as well as attendance at all tests and trials.~~

53    ~~**b    Tests and Trials**~~

54    ~~Owner shall give timely notice to Charterer of all tests and trials of the Vessel, its equipment and~~
55    ~~components and, provided Charterer's representatives are present at the time and place~~
56    ~~appointed for such trials or tests, Owner shall arrange with the Builder for Charterer's~~
57    ~~representatives' attendance at such trials or tests at Charterer's risk and expense.  Provided that~~
58    ~~such timely notice has been given by Owner, a failure by Charterer's representatives to attend~~
59    ~~such trials or tests at the time and place specified in such notice shall be deemed a waiver by~~
60    ~~Charterer of its right to attend such trials or tests.~~

61    ~~**c    Interference with Builder**~~

62    ~~Any monitoring carried out by Charterer pursuant to this Clause 2 shall not entitle Charterer or its~~
63    ~~representatives to make any request or recommendation directly to Builder or any of Builder's~~
64    ~~subcontractors, except through Owner.~~

65    ~~**d    Charterer's Proposed Construction Changes**~~

66    ~~Subsequent to Charterer's initial approval of the Specifications, Owner shall approve and cause~~
67    ~~Builder to undertake changes to the Specifications (as that term is defined in the Building~~
68    ~~Contract) as Charterer may propose prior to delivery of the Vessel under the Building Contract.~~
69    ~~All additional costs incurred by Owner as a direct result of such changes, except any such~~
70    ~~changes as may be compulsory, shall be for Charterer's account.~~

71    ~~**e    Owner's Obligations Undiminished**~~

72    ~~Owner's obligations under the Building Contract and the Charter shall not be affected by whether~~
73    ~~or not Charterer shall have carried out any monitoring of the Vessel construction under the terms~~
74    ~~hereof or by any requests or observations made or not made by Charterer or Charterer's~~
75    ~~representatives to Owner or Owner's representatives during or after any such monitoring.~~

76    ~~**f    As-Built Vessel Inspection**~~

77    ~~Following all Vessel trials, and correction of any faults or deficiencies found thereby, Charterer~~
78    ~~shall conduct (at or off the Shipyard) a final as-built inspection of the Vessel before the Vessel is~~
79    ~~tendered for delivery by Builder to Owner.  Subject to Charterer's satisfaction that the Vessel is in~~
80    ~~all respects as described and warranted under the Charter, Charterer will accept the Vessel when~~

81  ~~delivered by Owner in accordance with Clause 5; provided, however, that the Vessel is then in all~~
82  ~~material respects in the same condition as at the time of the foregoing as-built inspection.~~

## 3  Hire

### a  Payment of Hire

85  Charterer shall pay hire for the use of the Vessel in United States dollars per day, or pro rata for
86  part of a day.  Payments shall be made monthly *in advance*.  Owner shall send invoices for hire
87  to Charterer by the first (1st) day of the calendar month for which hire is due and Charterer shall
88  pay hire due by the *first (1st)* ~~fifteenth (15th)~~ day of the calendar month or five (5) working days
89  after receipt of Owner's invoice, whichever is later.  Payments shall be made to:

90  *Wells Fargo Bank N.A., 420 Montgomery Street, San Francisco, CA  94104, bank routing #*
91  *121000248, account # 4941750929  Bouchard Transportation Co., Inc.*

92   Payments shall be made by electronic funds transfer, without discount or adjustment ~~except as~~
93  ~~specified in Clause 3 or elsewhere in the Charter~~, commencing with the date and hour (UTC) the
94  Vessel is placed at Charterer's disposal as specified in Clause 5 and continuing to the date and
95  hour (UTC) the Vessel is redelivered to Owner at the expiration or any termination of the Charter,
96  except as may otherwise be provided in the Charter.  Any hire paid in advance and not earned
97  shall be returned to Charterer at once by Owner and/or by any party to whom Owner may have
98  permissively assigned the hire hereunder.  Owner, in any event, shall be jointly and separately
99  responsible, along with any such assignee, for such return of hire.  In no event will initial payment
100  of hire be made until the Vessel is placed at Charterer's disposal as provided in the Charter.
101  Charterer shall not be responsible for any delay or error by Owner's bank in crediting Owner's
102  account with hire, provided Charterer has made proper payment of hire within the time permitted
103  under Clause 3~~, including, without limitation, the grace period specified in Clause 3f~~.

### (1) Hire Rate for Firm Period

105   *$14,000.00 per day*

### (2) Hire Rate for Optional Period(s)

107  *~~[Insert "There are no Optional Periods under the Charter," or the appropriate hire rate(s) for~~*
108  *~~the optional period(s), if any.  For example:~~*

### (a) First Optional Period

110   *$14,000.00 per day.*

### (b) Second Optional Period

112   *$14,000.00 per day.*

### ~~(3) Hire Rate for Off-Hire Extensions~~

114  ~~The daily rate of hire for any extended period due to off-hire in accordance with Clause 1c~~
115  ~~shall be the rate that was in effect at the time of the off-hire.~~

### b  Deductions     *DELETED*

117  ~~Charterer shall be entitled to deduct from hire payments any:~~

118  ~~1)   disbursements for Owner's account, including commissions thereon;~~

119  ~~2)   lay-up savings calculated in accordance with Clause 17;~~

120  ~~3)   previous overpayments of hire, including the value of past off-hire;~~

121  ~~4)   amounts representing expenses incurred by Charterer relating to off-hire periods ("**Related**~~
122  ~~**Off-Hire Expense**");~~

123 ~~5)   amounts representing the value of off-hire periods and Related Off-Hire Expense anticipated~~
124 ~~to occur during the month or other period for which a payment of hire to be is made, it being~~
125 ~~understood and agreed that Charterer shall not be required to make a monthly advance or~~
126 ~~other payment of hire if Vessel is, on the due date for payment, off-hire;~~

127 ~~6)   any sums due pursuant to Clause 3c;~~

128 ~~7)   claims pursuant to Clause 9, and;~~

129 ~~8)   other sums to which Charterer is entitled under the Charter.~~

130 ~~Charterer shall have the right of deduction under subparagraphs 1) through 8) above, even where~~
131 ~~right of deduction is disputed, provided Charterer's claim of deduction is made in good faith.  Any~~
132 ~~required adjustment for hire deduction shall be made after all facts are established.  Any~~
133 ~~difference between the amount(s) withheld and the amount(s) due shall be refunded or credited,~~
134 ~~as the case may be, in hire installment(s) due after any adjustment is determined.~~

135 **c   Final Voyage**

136 **(1) Use of the Vessel**

137 Notwithstanding Clause 1a, should the Vessel be on a final ballast/laden voyage or on a ship-
138 to-ship transfer (**"Final Voyage"**) at the expiry of the Charter Term as calculated in
139 accordance with Clauses 1a, 1b and 1c, Charterer shall have the continued use of the Vessel
140 under the same Charter terms and rate of hire then prevailing under the Charter for such
141 length of time as is necessary to complete the voyage or ship-to-ship transfer, as the case
142 may be, and to thereafter effect redelivery of the Vessel to Owner at the place of redelivery
143 under the Charter.  Any such period of continued use shall be deemed to be part of the
144 Charter Term.

145 **(2) Hire payment**

146 Should a payment of hire become due, when the Vessel is on the Final Voyage, said
147 payment shall be made for the time estimated by Charterer to be necessary to complete the
148 Final Voyage and effect redelivery of Vessel to Owner in accordance with the Charter,
149 ~~less all deductions provided for in Clause 3b, which deductions shall be estimated by~~
150 ~~Charterer if the actual amounts cannot then be reasonably ascertained, and also less the~~
151 ~~amount estimated by Charterer to become payable by Owner for fuel on redelivery as~~
152 ~~provided in Clause 19.~~  Upon Vessel redelivery, any difference between the estimated and
153 actual amounts shall be refunded to or paid by Charterer, as the case may require.

154 **d   Loss of Vessel**

155 Should the Vessel be lost, or be missing and presumed lost, hire shall cease at the time of the
156 loss, or if such time is unknown, at the time when the Vessel was last heard from.  If the Vessel
157 should become a Constructive Total Loss (**"CTL"**), hire shall cease at the time of the casualty
158 resulting in such loss.  In either case, any hire paid in advance and not earned shall be returned
159 to Charterer and, in addition, Owner shall reimburse Charterer for the value of the estimated
160 bunkers on board the Vessel at the time the Vessel went off-hire.  If the Vessel should be missing
161 when a payment of hire would otherwise be due, such payment shall be postponed until the
162 safety of the Vessel is ascertained.  If the Vessel should become a CTL, Charterer shall have the
163 option to cancel the Charter on written notice to Owner.  The Vessel shall be deemed a CTL
164 under the Charter when the cost of recovering and repairing the Vessel is reasonably estimated
165 to exceed either the Vessel's then current insured value or the fair market value of the Vessel
166 when repaired, without in the latter case taking into consideration any value of the Charter.

167 ~~e   Reduction in Hire~~

168 ~~Should the Vessel, for any reason during the Charter Term, fail to fulfill the particulars,~~
169 ~~capabilities, capacities, and/or conditions stipulated in Clause 2, Clause 4, or elsewhere in the~~
170 ~~Charter, Charterer shall be entitled, without prejudice to any claim Charterer may otherwise have~~

171 ~~under the Charter, to a reduction in the hire to compensate Charterer for such failure; and, where~~
172 ~~the failure affects the time taken by the Vessel to perform any services under the Charter or the~~
173 ~~availability of the Vessel for such services, hire shall be reduced by an amount equal to the value~~
174 ~~of the time so lost, using the rate of hire applicable at that time.~~

175 **f    Default**

176    In default of punctual and regular payment of hire as specified in the Charter, Owner will notify
177    Charterer at:

178    *NAME: Chris Scott*

179    *TITLE: CFO*
180    *COMPANY: Novum Energy Trading Inc.*

181    *EMAIL: CS@NovumEnergy.com*

182    *PHONE: 832-485-1600*

183    (or such other address as Charterer may, subsequent to the date of the Charter, advise Owner in
184    writing) whereupon Charterer shall make payment of the amount due within **five (5)** ~~ten (10)~~
185    working days of receipt of said notification from Owner, failing which Owner shall have the right,
186    on written notice to Charterer given prior to any receipt of late payment by or on behalf of Owner,
187    to withdraw the Vessel from the service of Charterer without prejudice to any claim Owner may
188    otherwise have against Charterer under the Charter.

189    **g    Extra Expenses and Advances**

190    The hire rate(s) set forth in Clauses 3a(1) and 3a(2) cover in full any and all expenses for extra
191    victualling by the Master, communications charges, and all overtime worked by the Vessel's
192    officers and crew at Charterer's request.  ~~Charterer shall be entitled to a two and one-half percent~~
193    ~~(2.5%) commission on any sums advanced or disbursements made for Owner's account.~~
194    ~~Charterer shall make no cash advances to the Master.  However, Owner shall have the option of~~
195    ~~making advances to Charterer, or its designated agent, for disbursement (provided such~~
196    ~~advances are deemed adequate and reasonable by Charterer) and, in such event, no~~
197    ~~commission shall be paid to Charterer.~~

198    **h    Hourly Rate of Hire**

199    The hourly rate of hire (**"Hourly Rate of Hire"**) for any period under the Charter shall be one
200    twenty-fourth (1/24th) of the then-prevailing daily rate of hire.

201    **i    Taxes**

202    All taxes, and dues in the nature of a tax, on Owner's income (howsoever described) shall be for
203    Owner's account.  All taxes and dues on the Vessel and/or cargo and/or on freights, arising out of
204    cargoes carried or ports at which the Vessel calls in accordance with Charterer's orders under the
205    Charter, shall be for Charterer's account if and to the extent that they are imposed because of
206    Charterer's orders or in connection with the Vessel's service to Charterer under the Charter.

207    ~~If Charterer is obliged to deduct withholding tax from any payment due Owner, because of any~~
208    ~~action by or responsibility of Owner (whether in relation to Owner's business generally or to the~~
209    ~~Vessel), Charterer shall pay only the net amount due Owner after such deduction.  However,~~
210    ~~where a tax or dues is for Charterer's account but such tax or dues takes the form of a mandatory~~
211    ~~withholding of part of a payment due to Owner from Charterer, then such payment shall be~~
212    ~~increased such that the net amount received by Owner after the mandatory withholding shall be~~
213    ~~amount contractually due from Charterer to Owner.~~

214    ~~Notwithstanding any other provision of the Charter, Charterer shall not be liable for any taxes or~~
215    ~~dues:~~

216       1) ~~if they are imposed at ports and/or places where the Vessel calls solely for Owner's~~
217         ~~purposes, or to the extent that they are imposed with reference to periods when the Vessel~~
218         ~~has deviated from Charterer's ordered voyage or is off-hire, and/or~~

219       2) ~~if they would not have been imposed but for some action or fact that is the responsibility of~~
220         ~~Owner not related exclusively to the service of the Vessel under the Charter, and/or~~

221       3) ~~to the extent that they are subject to increase due to some action, fact or reason that is the~~
222         ~~responsibility of Owner and is not related exclusively to the service of the Vessel under the~~
223         ~~Charter.~~

## 224   4  Owner's Warranties

### 225   a  Vessel Condition

226 Owner warrants that, at the time the Vessel is placed at Charterer's disposal, the Vessel shall be
227 tight, staunch, and strong; in thoroughly efficient order and condition, and in every way fit,
228 manned, equipped and supplied for the service contemplated; with holds, cargo tanks, pipelines
229 and valves clear, clean and tight; and its machinery, pumps, boilers, ~~inert gas system, crude oil~~
230 ~~washing system~~, navigational equipment, heating coils, and all other equipment fully functional
231 and in good working order and condition, and in every way seaworthy and fit to carry cargoes
232 required under the Charter. In addition, Owner warrants that the Vessel (including the number
233 and arrangement of its fuel tanks) is configured so as to permit unrestricted trading within
234 emission control areas without the need to remove and replace fuel to economically comply with
235 the fuel requirements of such emission control areas. Such description, particulars, and
236 capabilities of the Vessel shall be maintained by Owner throughout the Charter Term, so far as is
237 possible by the exercise of due diligence. In the event of a conflict between Clause 4a and
238 Clause 2, Clause 2 shall prevail to the extent of the conflict.

### 239   b  Vessel Management and Operation

240 Owner warrants that the Vessel will be managed and operated during the Charter Term by the
241 company or companies named in 0. Owner shall not change the management and/or operation
242 of the Vessel during the Charter Term without the prior written consent of Charterer. If Owner
243 transfers the operation and/or management of the Vessel to another entity without Charterer's
244 prior written consent, in addition to its other rights Charterer may (in its absolute discretion and
245 upon written notice to Owner) either place the Vessel off-hire until Charterer is satisfied that the
246 transfer will have no adverse impact upon Charterer and its use of the Vessel, or terminate the
247 Charter.

### 248   ~~c  Evaporator~~

249 ~~Owner warrants that, during the Charter Term, the Vessel shall be equipped with a fresh water~~
250 ~~evaporator, which shall be maintained in good operating condition. Owner warrants that this~~
251 ~~evaporator is capable of making sufficient fresh water to supply the Vessel's needs.~~

### 252   d  Stability and Structural Integrity

253 Owner warrants that, during the Charter Term, the Vessel shall be suitable to carry cargoes in
254 any size ranging from no cargo to a full cargo (up to the appropriate Classification Society load
255 line), with relative density ranging from 0.6 to 1.2, without incurring operational restrictions
256 resulting from potential stability or structural problems.

### 257   ~~e  Cargo Heating~~

258 *~~Owner will make best efforts to maintain cargo temperature but with no guarantee.~~*

259 ~~If the Vessel is described in 0 as being fitted with cargo heating coils or heat exchangers, Owner~~
260 ~~warrants that, during the Charter Term, the Vessel shall be capable of maintaining the~~
261 ~~temperature of the cargo loaded and/or increasing such temperature by 4.0°C per day during the~~

262 ~~voyage up to a maximum of 57° C (in either case as instructed by Charterer) and maintaining~~
263 ~~same throughout the voyage and during the entire discharge. Should the Vessel fail to heat~~
264 ~~cargo in accordance with Charterer's instructions, Charterer shall have the option to:~~

265 ~~1) delay discharge of the cargo; and/or~~

266 ~~2) delay berthing of the Vessel; and/or~~

267 ~~3) discontinue discharge and remove the Vessel from the discharge berth or place until cargo is~~
268 ~~heated in accordance with Charterer's instructions.~~

269 ~~Any time lost due to the Vessel's failure to maintain the temperature of the cargo, or to heat the~~
270 ~~cargo, in accordance with Charterer's instructions shall be off-hire time and for Owner's account;~~
271 ~~including, without limitation, any delay in moving the Vessel from and then back to a berth or~~
272 ~~place of discharging and any intermediate waiting in a vessel queue. In addition, any expense~~
273 ~~incurred by reason of such delay or otherwise shall be for Owner's account.~~

274 **f    Cargo Manifolds**

275 Owner warrants that, during the Charter Term, the Vessel shall be equipped with pressure
276 gauges fitted outboard of the valve at each discharge manifold connection. Such gauges shall be
277 maintained in proper working condition and each gauge shall have a valid test certificate. The
278 Vessel shall be equipped with a sufficient number of cargo manifold reducing pieces, of steel or
279 comparable material (excluding aluminum and gray cast iron) and that meet the most recent Oil
280 Companies International Marine Forum (**"OCIMF"**) standards, to make available appropriate
281 flanges for cargo hoses or arms at all manifold connections on one side of the Vessel as follows:

282 ~~Vessels less than 16 kDWT shall be equipped to present flanges of 4", 6", 8" and 10" (ASA) and~~

283 Vessels from 16 to 60 kDWT shall be equipped to present flanges of 8", 10" and 12" (ASA) and

284 ~~Vessels over 60 kDWT shall be equipped to present flanges of 10", 12" 14", 16", and 20" (ASA).~~

285 **g    Communications**

286 Owner warrants that, during the Charter Term, the Vessel shall be equipped with VHF
287 radiotelephone, satellite communications earth station, facsimile machine, radio teletypewriter,
288 electronic mail capability, and such other radio telecommunications equipment as may be
289 required by international, flag state, and port state regulations. The Vessel shall also be fitted
290 with a computer capable of sending and receiving electronic mail (including attachments) as well
291 as maintaining and transmitting Charterer's logs via electronic mail to Charterer.

292 **h    Crew Complement**

293 Owner warrants that, during the Charter Term, the Vessel shall have a full and efficient
294 complement of Master, officers and crew, with adequate training and experience in operating all
295 of the Vessel's equipment, and that the Master and all officers shall possess valid and current
296 certificates and/or documents required, issued or approved by the country of the Vessel's
297 registry. Owner shall provide and maintain navigation and bridge organization manual(s) and
298 procedures that conform to the latest **US Coast Guard** International Chamber of Shipping and
299 International Maritime Organization standards. ~~The deck officer complement shall be not less~~
300 ~~than the Master and three (3) deck officers~~ **and one (1) licensed engineers in addition to the**
301 **Chief Engineer,** ~~except when the Vessel is engaged in discharging cargo to lighters when four~~
302 ~~(4) deck officers shall be provided.~~

303 Conversational English language proficiency is required for the Master and any officer in charge
304 of cargo or bunker oil handling, and is warranted under the Charter.

305 **i    Drug and Alcohol Policy**

306 Owner warrants that, during the Charter Term, it shall have a policy (**"Policy"**) on drug and
307 alcohol abuse applicable to the Vessel that meets or exceeds the standards in the latest edition of

308    OCIMF Guidelines for the Control of Drugs and Alcohol Onboard Ship.  Under the Policy, alcohol
309    impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater, the
310    appropriate seafarers to be tested shall be all the Vessel's officers, and the drug/alcohol testing
311    and screening shall include unannounced testing in addition to routine medical examinations.  An
312    objective of the Policy should be that the frequency of the unannounced testing be adequate to
313    act as an effective abuse deterrent, and that all officers be tested at least once a year through a
314    combined program of unannounced testing and routine medical examinations.  Owner further
315    warrants that the Policy will remain in effect during the Charter Term and that Owner shall
316    exercise due diligence to ensure that the Policy is complied with.  It is understood that an actual
317    impairment, or any test finding of impairment, shall not in and of itself mean Owner has failed to
318    exercise due diligence.  Persons who test positive, refuse to test, or are unfit for duty (impaired
319    because of drug or alcohol use) shall be removed from the Vessel during the remaining Charter
320    Term and shall not be reassigned to service of Charterer or any of Charterer's associated or
321    affiliated companies.

322    **j**   **Compliance**

323    Owner warrants that the Vessel shall, at all times during the Charter Term, be in full compliance
324    with all applicable international conventions, all applicable laws, regulations, and/or other
325    requirements of the country of the Vessel's registry and of the countries, political subdivisions of
326    such countries, and/or port authorities of the port(s) and/or place(s) to which the Vessel may be
327    ordered hereunder as noted below.  Owner further warrants that the Vessel shall have on board,
328    during the Charter Term, all certificates, records, or other documents required by the aforesaid
329    conventions, laws, regulations, or requirements, ~~including any required for transiting of the Suez~~
330    ~~or Panama Canal, by day or night, if such transit is possible~~.  Without limitation, the conventions,
331    laws, regulations, and requirements referred to in Clause 4j mean conventions, laws, regulations,
332    and requirements concerning ship size, ship design, safety, operation of ship's equipment
333    (including inert gas and crude oil washing systems, if the Vessel is so equipped), navigation,
334    pollution, and other like matters.  At the time of delivery and during the entire Charter Term, the
335    Vessel shall have on board an International Tonnage Certificate, or equivalent, and shall meet
336    applicable guidelines published by the OCIMF.  ~~In addition, Owner warrants that, if required by~~
337    ~~Charterer or the Vessel's trade, the Vessel will hold a valid International Transport Workers'~~
338    ~~Federation ("ITF") certificate or an equivalent document acceptable to Charterer throughout the~~
339    ~~Charter Term.  The Vessel shall be off-hire during any time lost as a consequence of ITF action~~
340    ~~and Owner shall reimburse Charterer for any Related Off-Hire Expense.~~  ***At time of delivery and***
341    ***throughout charter term, the Vessel will meet all requirements to discharge at US LOOP.***
342    ***Any additional equipment necessary for LOOP trading shall be for Owner's account.***

343    **k**   **Charterer's Representatives**

344    Owner warrants that, during the Charter Term, Charterer shall have the right to have its
345    representatives visit the Vessel to observe operations and review the Vessel's performance
346    records as often and at such intervals as Charterer elects.  Such visits shall include, but not be
347    limited to, access to pump room(s), engine room(s), cargo control room(s), navigation bridge, and
348    deck areas.  Owner shall allow Charterer's representatives to survey and take samples of all the
349    Vessel's bunker tanks and cofferdams at loading, discharge and/or bunkering ports.  Charterer's
350    representatives shall also have the right to attend on board the Vessel to ascertain the
351    circumstances of any incident involving cargo carried hereunder.  Neither the exercise nor non-
352    exercise by Charterer of any such right shall in any way absolve or reduce the obligations of
353    Master and/or Owner under the Charter.

354    **l**   **Quality Assurance**

355    **(1)  Regarding the Vessel**

356    If at any time during the Charter Term one or more of the below circumstances occur:

- Owner is in breach of its obligations under Clause 2 and/or any of Clauses 4a through 4k and/or Clause 6a and Owner fails, to Charterer's reasonable satisfaction, to cure such breach within thirty (30) consecutive days after Charterer sends written notice to Owner specifying the breach(s) and demanding correction, and/or

- the Vessel is responsible for an incident that results in damage to the Vessel, its equipment, or other property in excess of US$ ~~100,000~~ *750,000*, or that results in a discharge of oil of *10,000* U.S. gallons or more, and/or

- the Vessel is off-hire for a total of two hundred forty (120) cumulative unplanned hours during any three hundred sixty-five (183) day period during the Charter Term,

upon each occurrence of any of the above circumstances, Charterer shall have the option on written notice to Owner, which may be given at any time, to terminate the Charter with immediate effect if the Vessel is free of cargo or at a date and time as stated in Charterer's notice, such termination being without prejudice to any other rights and remedies Charterer may have under the circumstances**, although Owner will be provided opportunity of 30 days to take corrective action, prior to cancellation**.  Owner warrants that Owner and the Vessel's Master will comply with all orders and/or instructions given by Charterer with respect to the reporting to Charterer of any incidents affecting the Vessel and/or cargo.  In all cases, Owner shall ensure that Charterer is promptly advised of all accidents to and/or pollution incidents involving the Vessel, and of any Vessel system failure.

**(2)  Regarding the Operator**

Charterer's designated vetting organization has rated the Vessel Operator named in item 2.2 of ~~0~~ <span style="color:red">**Q-88 Questionnaire**</span> as being eligible for time charters as indicated in item 2.2.9 of 0.  Such rating is based in part upon an assessment of the Vessel Operator's OCIMF Tanker Management and Self Assessment report (**"TMSA"**) provided by the Vessel Operator.  Owner warrants that, as of the date of the Charter and throughout the Charter Term, the TMSA does and will continue to accurately reflect the status of the Vessel Operator's safety and quality-management systems.  Owner further warrants that during the Charter Term the Vessel Operator will maintain or improve the safety and quality-management achievement levels for each Element identified in the TMSA as of the date of the Charter and set forth in 0.  Owner shall authorize or procure permission for Charterer's representatives to review the status of the Vessel Operator's safety and quality-management systems with respect to the levels of achievement for each Element stated in the TMSA at any time during the Charter Term; provided, however, that reasonable notice of any such review has been given to Owner and the date(s) of such review agreed with the Vessel Operator.  If Charterer's representatives find that the Vessel Operator has failed to maintain the safety and quality-management achievement levels identified in the TMSA as required by this Clause, and corrective action acceptable to Charterer (which acceptance shall not be unreasonably withheld) is not taken within three (3) months after notice of such failure is given by Charterer to Owner, ~~Charterer may, at its option and upon written notice to Owner, require Owner to promptly change the Vessel Operator to another operator of Owner's choice that is then eligible for time charters as specified in item 2.2.9 of 0.  If Owner does not promptly change the Vessel Operator in accordance with this Clause 4l(2), such failure shall be deemed a fundamental breach of the Charter and in such event~~ Charterer shall have the option on written notice to Owner to terminate the Charter with immediate effect if the Vessel is free of cargo or at a date and time as stated in Charterer's notice, such termination being without prejudice to any other rights and remedies Charterer may have under the circumstances.

**m  Security**

~~Owner warrants that it will take reasonable measures to protect the Vessel, its crew and the cargo from the threat of piracy and other security risks.  Owner further warrants that armed contract security guards ("Guards") will not be placed on the Vessel unless Owner has disclosed its intent to use Guards to Charterer, has complied with any informational requests from~~

408 Charterer's designated vetting organization (**"Vetting Organization"**), and has received
409 notification that the Vetting Organization has determined the information so provided to be
410 satisfactory.  It is understood and agreed, however, that the Master and Owner shall continue to
411 be fully and solely responsible for the operation, management and navigation of Vessel during the
412 entire voyage including oversight of the guards while onboard.

413 Owner warrants that the Master, officers, crew and any Guards will act in a manner that respects
414 all human rights, complies with all applicable laws and is consistent with the principles contained
415 in the latest version of the International Code of Conduct for Private Security Service Providers.

416 In the event that Guards are deployed onboard the Vessel, Owner and Vessel shall be liable for
417 and hereby indemnify, and will defend and hold harmless Charterer and its affiliates against any
418 and all claims, costs, expenses, actions, proceedings, suits, demands and liabilities related to the
419 personal injury or death of Owner's personnel, the Guards, and/or any third-party persons, as well
420 as damage or loss to the Vessel, property of the Guards, and/or third-party property, insofar as
421 such injuries, death, loss or damages arise from or are in any way connected to the deployment
422 of Guards onboard the Vessel.

423 Clause 4 shall be without prejudice to Clause 13.

## 424 **5   Delivery**

### 425 **a   Place of Delivery**

426 The use and services of the Vessel shall be placed at the disposal of Charterer ***at Galveston Bar***
427 ***in US Gulf or Port Arthur Anchorage by April 5/0001-10/2359, 2019 to be declared/narrowed***
428 ***to a (2) Two Day window by Novum by March 30th, 2018*** (**"Place of Delivery"**).  Charter hire
429 shall **continue uninterrupted** commence when the Vessel is at the Place of Delivery and in all
430 respects ready to load and otherwise fully perform the Charter and ready for sea, and written
431 notice thereof has been given by the Master to Charterer or its Agents at the Place of Delivery.

432 Hire shall not commence before *[Insert the first day of the delivery range]*, except with Charterer's
433 written pre-consent, and the Vessel shall be placed at Charterer's disposal, in accordance with
434 the provisions of Clause 5a, no later than *[Insert the last day of the delivery range]* (**"Canceling**
435 **Date"**), in default of which Charterer shall have the option to cancel the Charter.  Charterer's
436 option to cancel the Charter is declarable not later than seventy-two (72) hours after expiration of
437 the Canceling Date, local time at the Place of Delivery.  Cancellation by Charterer, or acceptance
438 of the use of the Vessel's services, shall be without prejudice to any claims for damages
439 Charterer may have for late tender of the Vessel's services or other breach of Owner's obligations
440 under the Charter.  Owner shall give Charterer written notices of the Vessel's estimated time of
441 arrival at the Place of Delivery *[Insert notification requirements (e.g.; 180, 90, 60, 30, 20, 10, 5, 2,*
442 *and 1)]* days prior to Owner's anticipated time of delivery.  If, prior to the Canceling Date, it
443 appears to Charterer that the Vessel will not be ready for delivery under the Charter by the
444 Canceling Date, Charterer shall have the option on written notice to Owner:

445 1)   to cancel the Charter, or

446 2)   to require Owner to promptly give in writing to Charterer a new canceling date, with
447       continuing right in Charterer to cancel the Charter, at any time prior to the original Canceling
448       Date, either before or after receipt of any new canceling date that Owner may provide in
449       accordance with Charterer's requirement.

450 If Charterer accepts a new canceling date in writing, the Vessel shall use utmost dispatch to meet
451 such date and the terms of Clause **Error! Reference source not found.** shall otherwise apply to t
452 his new date as if it was the original Canceling Date.

453 **b  Fuel at Delivery**

454  Charterer shall accept and pay for all fuel in the Vessel's bunker tanks at the time the Vessel is
455  placed at Charterer's disposal.  Payment for such fuel shall be in accordance with the last
456  documented net price paid by Owner, excluding any delivery charges.

457 **c  Space Available to Charterer**

458  The whole reach and burthen of the Vessel (but not more than she can reasonably stow and
459  safely carry) shall be at the Charterer's disposal, reserving proper and sufficient space for the
460  Vessel's officers, crew, Master's cabin, tackle, apparel, furniture, fuel, provisions, and stores.

461 **6  Trading Limits**

462 **a  Trading Range**

463  The Vessel may be employed in *US Coastwise trade (US Atlantic Coast and US Gulf Coast*
464  *including Florida or East Coast Mexico or Caribbean) or as mutually agreed between*
465  *Owner and Charterer always excluding any countries under United States Sanctions,* ~~any~~
466  ~~part of the world, trading without restriction~~ between and at ports and/or places in such lawful
467  trades as Charterer or its agents may direct subject to the limits of the current International
468  Navigating Conditions and any subsequent amendments thereto, ~~but may be sent to ports and~~
469  ~~places on the St. Lawrence River and tributaries between May 15 and November 15 and through~~
470  ~~the Straits of Magellan and around Cape Horn and the Cape of Good Hope at any time of the~~
471  ~~year without payment of any extra premium.  Notwithstanding the foregoing restrictions, the~~
472  ~~Vessel may be sent to Baltic Sea ports not north of Stockholm, and to Helsingfors and Abo,~~
473  ~~Finland, and other ports and places as set forth in the International Navigating Conditions and~~
474  ~~Clauses, provided, however, that Charterer shall reimburse Owner for any additional documented~~
475  ~~premium properly assessed by the Vessel's underwriters and paid by Owner for breach of such~~
476  ~~trade warranties~~.  In the event that the Vessel shall, for any reason, be unable to be employed in
477  trade as described in this Clause 6a, all time lost shall be for Owner's account without prejudice
478  to any other rights and remedies Charterer may have, including but not limited to the rights and
479  remedies contained in Clause 4l.

480 **b  Berths and Lightering**

481  The Vessel shall be loaded, discharged, or lightened at any suitable port or place as Charterer
482  may direct.  Notwithstanding anything contained in Clause 6 or any other provisions of the
483  Charter, Charterer shall not be deemed to warrant the safety of any port or place and shall not be
484  liable for any loss, damage, injury, or delay resulting from conditions of, or at, ports or places not
485  caused by Charterer's fault or neglect when directing the Vessel to such ports or places or which
486  could have been avoided by the exercise of reasonable care on the part of the Master or Owner.

487  When the Vessel is employed as a lightering vessel, in order to assist the Vessel, Master, and
488  Owner in the lightering operation, whether at anchorage or underway, Charterer may, at its
489  option, provide and pay for *P&I, Hull, cargo and other insurances,* lightering advisor(s) and
490  lightering gang to be employed under the exclusive direction, supervision, and control of the
491  Vessel's Master, who shall continue to be fully responsible for the operation, management, and
492  navigation of the Vessel during the entire lightering operation.  In the event it is necessary for
493  Owner to incur additional hull insurance premium directly related to the employment of the Vessel
494  as a lightering vessel, Charterer agrees that such provable and necessary additional premium
495  shall be for Charterer's account.

496  Lightering and ship-to-ship transfer operations*, undertaken at a safe anchorage as deemed by*
497  *Captain, and never underway,* shall be performed in accordance with, and meet or exceed, the
498  standards in the latest OCIMF guidelines for ship-to-ship transfers.

499   ~~c   **Vessel Speed Orders**~~

500   ~~Charterer may issue orders directly to the Master to slow down or speed up the Vessel,~~
501   ~~consistent with the safe operation of the Vessel and its machinery, on ballast and/or laden~~
502   ~~passages.  A copy of any such orders shall also be sent to Owner.~~

503   **d   Controlled Passages**

504   The following passages shall not be navigated by the Vessel while performing under the Charter
505   without Charterer's prior written agreement:

506   ~~1)   The Strait of Messina~~

507   ~~2)   The Strait of Bonifacio~~

508   ~~3)   Between the Scilly Islands and Land's End~~

509   ~~4)   The Minches, if the Vessel is over 10,000 Gross Tons~~

510   ~~5)   If bound to port(s) on the East Coast of the U.K., north of the River Thames, the in-shore~~
511   ~~traffic zones in the English Channel~~

512   6)   The Old Bahama Channel

513   When transiting the Florida Straits, from Key Biscayne south to the Dry Tortugas, the Vessel shall
514   maintain a distance of not less than ten (10) miles off the outer navigational aids marking the
515   reefs off the Florida Keys.  When transiting the Windward Passage or the Yucatan Channel, the
516   Vessel shall give the coast of Cuba a wide berth.  It is understood and agreed that the daily rate
517   of hire includes all compensation for the restrictions in Clause 6d.

518   **e   Ship Inspection Report (SIRE) Program**

519   Owner shall ensure that during the Charter Term there is on file with OCIMF a complete and
520   correct SIRE Vessel Particulars Questionnaire.  Further, Owner shall make its best efforts to
521   ensure that, throughout the Charter Term, there shall be on file with OCIMF a SIRE report
522   submitted within the past five (5) months, if possible by a major international oil company that is a
523   member of OCIMF and not an associated or affiliated company of Charterer.  Owner shall
524   promptly notify Charterer and Charterer's designated vetting organization whenever a SIRE
525   inspection takes place for any reason.  Any cost of complying with this Clause 6e, and any time
526   lost by reason of Owner's failure to so comply, shall be for Owner's account.  The cost of any
527   additional inspections ordered by Charterer shall be for Charterer's account.

528   ~~**7   Dry Cargoes**~~

529   ~~Charterer shall have the option of shipping any lawful dry cargo in bulk, for which the Vessel and her~~
530   ~~tanks are suitable, and any lawful merchandise in cases and/or cans and/or other packages in the~~
531   ~~Vessel's forehold, between decks, and/or other suitable space available, subject, however, to the~~
532   ~~Master's approval as to kind and character, amount and stowage.  All charges for dunnage, loading,~~
533   ~~stowing, and discharging so incurred shall be paid by Charterer.~~

534   **8   Speed, Fuel and Pumping**

535   Owner ***will make best efforts*** during the Charter Term, ***for*** the Vessel ***to*** meet the speed, fuel, and
536   pumping  stipulated in Clause 8.

537   **a   Speed Performance Warranty**

538   ***Owner will make best efforts to maintain an average speed of 9.0 knots, laden and ballast,***
539   ***from seabuoy to seabuoy, at Beaufort Force 4 or less.***

540   ~~Owner warrants that the Vessel is capable of maintaining, and shall maintain, on all sea~~
541   ~~passages from sea buoy to sea buoy, a guaranteed average speed of not less than~~ *[Insert the*

542 ~~*proper warranty speed]* knots in a laden condition and not less than *[Insert the proper warranty*~~
543 ~~*speed]* knots in a ballast condition (**"Warranty Speed"**). Speed warranty performance to be~~
544 ~~excluded for periods of wind conditions exceeding force six (6) on the Beaufort Scale persisting~~
545 ~~for more than twelve (12) consecutive hours. The Master shall promptly advise Charterer in~~
546 ~~writing whenever the Vessel encounters wind conditions exceeding Beaufort Force Six (6), and~~
547 ~~again when the wind conditions moderate to Beaufort Force Six (6) or less.~~

548 **b  Fuel Consumption Warranty**

549 **(1)  Propulsion and Auxiliary Fuel**

550 *Owner will make best efforts to maintain the following daily fuel consumptions, which*
551 *are best estimates:*

552 *Barge B NO. 240*

553 *Running/Standby:          200 gallons per day*

554 *Loading:                         150 gallons per day*

555 *Pumping:                        2,200 gallons per day*

556 *Tug BARBARA E. BOUCHARD*

557 *Running:                         6,200 gallons per day*

558 *Standby:                         300 gallons per day*

559 ~~warrants a maximum daily fuel consumption on all sea passages from sea buoy to sea buoy~~
560 ~~of high viscosity fuel oil meeting the latest quality standards of ISO 8217 RMG 380 (**"HFO"**)~~
561 ~~and marine diesel fuel meeting the latest quality standards of ISO 8217 DMB or better~~
562 ~~(**"DMB"**) for all purposes, including ballast handling but excluding heating and tank cleaning~~
563 ~~(**"Warranty Consumption"**), as listed below. Fuel consumption warranty performance to be~~
564 ~~excluded for periods of wind conditions exceeding force six (6) on the Beaufort Scale~~
565 ~~persisting for more than twelve (12) consecutive hours.~~

*[Insert the appropriate speed and consumption figures in the following table and paragraphs]*

| ~~Speed (knots)~~ | ~~HFO Laden (MT)~~ | ~~HFO Ballast (MT)~~ | ~~DMB (MT)~~ |
|---|---|---|---|
| ~~10.0~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~10.5~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~11.0~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~11.5~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~12.0~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~12.5~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~13.0~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~13.5~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~14.0~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~14.5~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~15.0~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~15.5~~ | ~~--~~ | ~~--~~ | ~~--~~ |
| ~~16.0~~ | ~~--~~ | ~~--~~ | ~~--~~ |

16.5       –          –          –

17.0       –          –          –

**(2) Heating and Tank Cleaning Fuel**

For each day heat is applied to the cargo or slop tanks, Owner warrants that the fuel consumption will not exceed *[Insert the appropriate quantity]* metric tons of HFO per day for maintaining heat, or *[Insert the appropriate quantity]* metric tons per day for increasing heat, of all tanks and pro rata for part of the tanks. For tank cleaning, other than crude oil washing, Owner warrants that the fuel consumption will not exceed *[Insert the appropriate quantity]* metric tons of HFO for washing all tanks, and pro rata for washing part of the tanks, which also includes shifting ballast and other tank cleaning functions.

**(3) Fuel Consumption in Port**

Owner warrants that the maximum fuel consumption in port shall be as follows:

**(a) When not within an IMO MARPOL Annex VI Emission Control Area**

Idle (at anchor or on berth): *[Insert the appropriate quantity]* MT of HFO per day (with boiler secured).

*[Insert the appropriate quantity]* MT of HFO per day (on standby with boiler on).

Loading: The Idle consumption warranted above for standby with boiler on plus an additional *[Insert the appropriate quantity]* MT of HFO for loading a full cargo, or pro rata for part cargo.

Discharging: The Idle consumption warranted above for standby with boiler on plus an additional *[Insert the appropriate quantity]* MT of HFO for discharging a full cargo, or pro rata for part cargo.

**(b) When within an IMO MARPOL Annex VI Emission Control Area**

Idle (at anchor or on berth): *[Insert the appropriate quantity]* MT of *[insert fuel grade]* per day (with boiler secured).

*[Insert the appropriate quantity]* MT of *[insert fuel grade]* per day (on standby with boiler on).

Loading: The Idle consumption warranted above for standby with boiler on plus an additional *[Insert the appropriate quantity]* MT of *[insert fuel grade]* for loading a full cargo, or pro rata for part cargo.

Discharging: The Idle consumption warranted above for standby with boiler on plus an additional *[Insert the appropriate quantity]* MT of *[insert fuel grade]* for discharging a full cargo, or pro rata for part cargo.

**c**    **Pumping Performance ~~Warranty~~**

Owner **will make best efforts** warrants **for** that the Vessel **to maintain the discharge of bulk liquid cargo.** ~~will discharge cargo.~~ at the following minimum rates: **100 PSI**

~~Light petroleum (viscosity less than 69 cSt at 50° C)~~ *[Insert the appropriate quantity]* ~~m³/hr.;~~

~~Medium petroleum (viscosity of 69 to 690 cSt at 50° C)~~ *[Insert the appropriate quantity]* ~~m³/hr.;~~

~~Heavy petroleum (viscosity above 690 cSt at 50° C)~~ *[Insert the appropriate quantity]* ~~m³/hr.;~~

608 ~~or that the Vessel will maintain throughout the entire period of discharge, including crude oil~~
609 ~~washing and stripping, an average pressure of 100 pounds per square inch gauge (PSIG) at the~~
610 ~~ship's manifold should the foregoing minimum rates not be met. Charterer shall have the option~~
611 ~~to Crude Oil Wash all or part of the Vessel's cargo tanks. In the event the Vessel uses crude oil~~
612 ~~cargo to wash cargo tanks during discharge, the Vessel shall be allowed an additional eight (8)~~
613 ~~hours for crude washing of all tanks or pro rata for crude washing part of the tanks.~~

614 **9 Performance Reviews** *Owner's performance is on a best-efforts basis, not*
615 *warranted.*

616 **a Performance Review Frequency and Compensation**

617 The speed, fuel consumption, and pumping performance *undertaken with best efforts-only*
618 guaranteed by Owner under Clause 8 will be reviewed by Charterer at the end of approximately
619 six (6) months, counting from the time of delivery of the Vessel to Charterer in accordance with
620 the Charter, and thereafter at approximately six (6) month intervals. The Vessel's performance
621 will be reviewed on a voyage-by-voyage basis in accordance with Clause 9b. ~~If it is found that~~
622 ~~the Vessel has failed to maintain the speed, fuel consumption, or pumping performance~~
623 ~~warranted during the preceding performance review period (or at any time during the Charter~~
624 ~~Term), Charterer shall be retroactively compensated in respect of such failings as follows:~~

625 ~~**(1) Speed Warranty Compensation**~~

626 ~~Payment to Charterer of the Hourly Rate of Hire for each hour, or pro rata for each part of an~~
627 ~~hour, that the Vessel steams in excess of the time the Vessel would have taken at the~~
628 ~~Warranty Speed under Clause 8a. Owner will receive no credit or compensation if Vessel~~
629 ~~performance with respect to speed is greater than the Warranty Speed.~~

630 ~~**(2) Fuel Performance Warranty Compensation**~~

631 ~~Payment to Charterer for each metric ton, or pro rata for part of a ton, in excess of the~~
632 ~~guaranteed daily consumption under Clause 8b for all purposes at sea for main engine and/or~~
633 ~~auxiliaries and/or heating and/or tank cleaning and while at anchor, loading, or discharging,~~
634 ~~including any excess not borne by Owner in accordance with Clause 11 of the Charter, at the~~
635 ~~average actual price paid for the particular grade of fuel oil purchased by Charterer for the~~
636 ~~total period under review. Charterer shall provide supporting price vouchers or invoices for~~
637 ~~such purchased fuel oil as soon as possible after completion of the review for the specified~~
638 ~~performance period. Subject to Clause 9b(2), Owner will receive no credit or compensation if~~
639 ~~the Vessel's fuel consumption is less than the Warranty Consumption.~~

640 ~~**(3) Pumping Performance Warranty Compensation**~~

641 ~~Charterer is to be compensated at the Hourly Rate of Hire for each hour, or pro rata for each~~
642 ~~part of an hour, that the Vessel takes in excess of the pumping time allowed per the rates~~
643 ~~warranted in Clause 8c. Owner will receive no credit or compensation if the Vessel is able to~~
644 ~~discharge at a rate greater than warranted in Clause 8c. If the terminal or place of~~
645 ~~discharging does not allow or permit the Vessel to meet the warranty specified in Clause 8c,~~
646 ~~the Master shall forthwith issue a Letter of Protest (which shall, if possible, be acknowledged)~~
647 ~~to such terminal or place and shall immediately advise Charterer in writing by electronic mail,~~
648 ~~telex, or facsimile. If the Master fails to issue the Letter of Protest, Owner shall be deemed to~~
649 ~~waive any rights to contest that time was lost as a result of the Vessel's failure to comply with~~
650 ~~the pumping warranties in Clause 8c. Any delay to Vessel's discharge caused by shore~~
651 ~~conditions identified in Master's Letter of Protest shall be taken into account in the~~
652 ~~assessment of pumping and loading performance.~~

653 **(4) Performance Review Basis**

654 The basis for determining the Vessel's performance in Clauses 9a(1) through 9a(3) shall be
655 the statistical data supplied by the Master in the Sea Logs, Port Logs, and Pump Logs
656 provided by Charterer.

657 **(5) Performance Claims Review**

658 Charterer shall provide Owner with an opportunity to review any claim submitted by Charterer
659 under Clause 9a and Owner shall complete such review and provide Charterer with the
660 results thereof within fifteen (15) days from the date such claim was sent by electronic mail or
661 facsimile from Charterer to Owner. Charterer may deduct from hire any amount to which it
662 claims it is entitled under Clause 9a after the expiration of twenty-five (25) days from the date
663 of Charterer's sending of a claim relating thereto to Owner. Such deduction shall be without
664 prejudice to Owner defending such claim.

665 **(6) Claim for Final Period**

666 In the event of Charterer having a claim in respect of Vessel's performance during the final
667 performance review period, the amount of such claim shall be withheld from hire in
668 accordance with Charterer's estimate made no earlier than three (3) months before the end of
669 the Charter Term and any necessary adjustment after the termination of the Charter shall be
670 made by Owner to Charterer or Charterer to Owner, as the case may require.

671 **b Performance Review Calculations**

672 **(1) Speed Warranty Calculations**

673 Speed performance will be determined by taking the shortest safe distance for the sea
674 passage as provided by AtoBviaC Plc, or other competent and independent source if
675 necessary(**"Voyage Distance"**), less the distance reported in the Vessel's Sea Log for
676 steaming from the sea buoy to the loading/discharge place inbound and from the
677 loading/discharge place to the sea buoy outbound, divided by the Warranty Speed to
678 determine charter party hours at sea. Total actual hours at sea, as reported in the Vessel's
679 Sea Log, will be compared to the charter party hours at sea to determine lost or saved hours.
680 Each laden and ballast sea passage shall be calculated independently and the results of
681 different sea passages shall not be averaged over time. For the avoidance of doubt, Vessel
682 over-performance with respect to speed on any voyage(s) shall not be deemed to offset
683 Vessel under-performance on any other voyage(s).

684 **(a) Speed Warranty Adjustments**

685 All stops at sea and any sea passage covered by an off-hire calculation will be excluded
686 from speed warranty calculations.

687 In the event the Vessel is ordered by Charterer to deviate during a sea passage, such
688 actual deviation miles and actual hours shall be recorded in the Vessel's Sea Log. For
689 the purpose of Clause 9b, deviation shall mean a change in course caused by a change
690 in destination ordered by Charterer after the Vessel has commenced its voyage to the
691 initial port or place ordered by Charterer. The actual deviation miles reported in the
692 Vessel's Sea Log will be added to the Voyage Distance for the sea passage performed
693 up to the point of deviation to determine the charter party hours for the passage.

694 In the event Charterer orders the Vessel to proceed at speed(s) greater than the
695 Warranty Speed on any sea passage, and the Vessel is able to achieve speed(s) greater
696 than the Warranty Speed, such sea passage will be excluded from speed and fuel
697 warranty calculations. In such cases, if the Vessel is unable to achieve speed(s) greater
698 than the Warranty Speed, then the speed and fuel warranty calculations for that sea
699 passage shall be based on the Warranty Speed.

| | |
|---|---|
| 700 | In the event Charterer orders the Vessel to proceed at speed(s) equal to or less than the |
| 701 | Warranty Speed on any sea passage, such sea passage will not be excluded from speed |
| 702 | and fuel warranty calculations which shall be based on Charterer's ordered speed(s) |
| 703 | unless Charterer orders the Vessel to proceed at a speed that is below the minimum |
| 704 | speed listed in the table provided in Clause 8b(1), in which case the periods of |
| 705 | compliance with such order shall be excluded from speed and fuel warranty calculations. |
| 706 | In the event Charterer orders the Vessel to adjust speed on any sea passage to arrive at |
| 707 | a port or place at a specified time, or orders the Vessel to proceed at Most Economical |
| 708 | Power (**"MEP"**) on any sea passage, the period under such orders on such sea passage |
| 709 | shall be excluded from speed and fuel warranty calculations. |
| 710 | Actual hours at sea recorded in the Vessel's Sea Log and corresponding Voyage |
| 711 | Distance(s) for passage in the following restricted waters will be excluded from speed |
| 712 | warranty calculations: |
| 713 | *English Channel* — Between NW/SE line through Bassurelle Light and NW/SE line |
| 714 | through Noord Hinder Light Vessel. |
| 715 | *Malacca/Singapore Straits, Eastbound through Passage* — Between NE/SW line through |
| 716 | 03-00 N, 100-40 E and Latitude 01-35 N. |
| 717 | *Malacca/Singapore Straits, Westbound through Passage* — Between Horsbourgh |
| 718 | Lighthouse and the Brothers Lighthouse. |
| 719 | *Malacca/Singapore Straits, Eastbound to Singapore Only* — Between NE/SW line |
| 720 | through 03-00 N, 100-40 E and 1 mile SW of Sultan Shoal Light. |
| 721 | *Malacca/Singapore Straits, From Singapore to Westbound Only* — Between 1 mile SW of |
| 722 | Sultan Shoal Light and the Brothers Lighthouse. |
| 723 | **(b) Speed Warranty Calculation Method** |
| 724 | Each sea passage not excluded from the speed performance review process as detailed |
| 725 | above will be calculated as follows: |
| 726 | (i) The Voyage Distance for the sea passage, minus the sum of the distance reported in |
| 727 | the Vessel's Sea Log for steaming from the sea buoy to the loading/discharge place |
| 728 | inbound and from the loading/discharge place to the sea buoy outbound and the |
| 729 | distance reported for passages in restricted waters, divided by the Warranty Speed |
| 730 | equals charter party hours. |
| 731 | (ii) Total actual hours at sea, minus the sum of time stopped at sea and time reported for |
| 732 | passage of restricted waters, minus charter party hours as determined in (i) above |
| 733 | equals hours saved or lost. |
| 734 | (iii) Hours lost, times the Hourly Rate of Hire, equals the amount due Charterer. |
| 735 | **(2) Fuel Warranty Calculations** |
| 736 | For each grade of fuel the following calculation is performed for each sea passage. Each |
| 737 | laden and ballast sea passage shall be calculated independently. Within each performance |
| 738 | review period, fuel saved on any voyage (including in-port consumption determined in |
| 739 | accordance with Clause 9b(4)) shall be credited against any excess consumption on other |
| 740 | voyages performed during the same performance review period. However, any net savings |
| 741 | of fuel during one performance review period shall not be credited against excess |
| 742 | consumption in any other performance review period and Owner shall receive no credit or |
| 743 | compensation for any net fuel savings during a performance review period. |
| 744 | **(a) Average Speed** |
| 745 | The Voyage Distance for the sea passage minus the sum of the distance reported in the |
| 746 | Vessel's Sea Log for steaming from the sea buoy to the loading/discharge place inbound |

| 747 | and from the loading/discharge place to the sea buoy outbound divided by the actual |
| 748 | hours at sea minus stops at sea reported in the Vessel's sea log equals the average |
| 749 | speed for fuel consumption purposes.  The distance steamed in restricted waters is not |
| 750 | excluded from the Voyage Distance included in this calculation. |

751 **(b)  Days at Sea**

752 Total actual hours at sea, minus the sum of stops at sea, divided by 24 equals the total
753 days at sea.

754 **(c)  Warranted Consumption**

755 Average speed as calculated in Clause 9b(2)(a) and rounded to the nearest tenth (1/10)
756 of a knot is compared to the fuel consumption table of guaranteed consumption and the
757 appropriate value(s), tons per day, is chosen.  The appropriate value is chosen as
758 follows:

759 (i)  If the average speed equals a value in the table, the corresponding fuel value is
760 selected.

761 (ii)  If the average speed falls between any two values in the table, the appropriate value
762 is determined by linear interpolation using the next lowest and the next highest
763 values in the table.

764 (iii) If the average speed falls below the lowest or above the highest value in the table,
765 the appropriate value is determined by linear extrapolation using the lowest two
766 values in the table when the speed is below the lowest value, or using the highest
767 two values in the table when the speed is above the highest value in the table.

768 Example of linear extrapolation:

769 Actual speed above the highest value in the table; e.g., 14.3 knots

770 Speed                              MT/Day
771 14.3 (Actual)                      ?
772 14.0                               38.0
773 13.5                               35.0
774 *[(14.3k-14k) x (38MT - 35MT) / (14k - 13.5k)]* + 38MT = 39.8MT

775 Actual speed below the lowest value in the table; e.g., 11.8 knots

776 Speed                              MT/Day
777 12.5                               31.0
778 12.0                               29.0
779 11.8 (Actual)                      ?
780 29MT - *[(12k-11.8k) x (31MT - 29MT) / (12.5k - 12k)]* = 28.2MT

781 **(d)  Allowed Consumption**

782 The total days at sea from Clause 9b(2)(b) times the appropriate value, in tons per day,
783 from the fuel table as detailed in Clause 9b(2)(c) equals Charter Party Allowed
784 Consumption.

785 **(e)  Amount Due Charterer**

786 Charter Party Allowed Consumption minus actual consumption as reported in the
787 Vessel's Sea Log equals tons saved or excess tons consumed.

788 Excess tons consumed, times the appropriate price as determined in accordance with
789 Clause 9a(2) equals amount due Charter.

~~**(3) Pumping Warranty Calculations**~~

~~For each discharge, the following calculations will be performed to determine any time lost during pumping, and any compensation due to Charterer.~~

~~**(a) Warranty Pumping Time**~~

~~The gross volume discharged, divided by the appropriate warranted pumping rate from Clause 8c, equals the Warranty Pumping Time.~~

~~**(b) Crude Oil Washing ("COW") Allowance**~~

~~The number of tanks crude oil washed, divided by the total number of cargo tanks, times the total time allowed for crude oil washing all tanks from Clause 8c equals the COW Allowance.~~

~~**(c) Charter Party Pumping Hours**~~

~~The sum of the Warranty Pumping Time, plus the COW Allowance, equals the Charter Party Pumping Hours.~~

~~**(d) Actual Pumping Hours**~~

~~The actual hours spent discharging cargo, including COW and stripping, equal the Actual Pumping Hours.~~

~~**(e) Hours Lost**~~

~~If the Actual Pumping Hours exceeds the Charter Party Pumping Hours, the difference equals Hours Lost.~~

~~**(f) Compensation Due Charterer**~~

~~Hours Lost, times the Hourly Rate of Hire, equals the amount of Compensation Due Charterer.~~

~~**(g) Waiver of Compensation Due Charterer**~~

~~If the minimum discharge pressure specified in Clause 8c is maintained throughout the discharge, including COW and stripping, there shall be no Compensation Due Charterer for that discharge.~~

~~**(4) In-Port Fuel Warranty Calculations**~~

~~For each grade of fuel the following calculation is performed for each port call. Each port call shall be calculated independently and the results of different port calls shall be included in the voyage calculations in accordance with Clause 9b(2).~~

~~**(a) Warranty In-Port Time**~~

~~The gross elapsed time from sea buoy inbound to sea buoy outbound less the time elapsed during passage inbound, passage outbound, and shifting between berths is the Warranty In-Port Time.~~

~~**(b) Idle Consumption Allowance**~~

~~The Warranty In-Port Time from Clause 9b(4)(a) times the appropriate value, in tons per day, from the idle allowance as detailed in Clause 8b(3) equals the Idle Consumption Allowance.~~

~~**(c) Loading Allowance**~~

~~The metric tons of cargo loading at the port, divided by the total metric tons loaded on the voyage, multiplied by the Loading warranty in Clause 8b(3) equals the Loading Allowance.~~

832    **(d)  Discharging Allowance**

833    ~~The metric tons of cargo discharged at the port, divided by the total metric tons~~
834    ~~discharged on the voyage, multiplied by the Discharging warranty in Clause 8b(3) equals~~
835    ~~Discharging Allowance.~~

836    **(e)  Allowed Consumption**

837    ~~(i)   Port Calls without Loading or Discharge~~

838    ~~If no cargo is loaded or discharged during a port call, the Allowed Consumption is the~~
839    ~~Idle Consumption Allowance.~~

840    ~~(ii)  Loading Port Calls~~

841    ~~If cargo is loaded during a port call, the Allowed Consumption is the Idle~~
842    ~~Consumption Allowance plus the Loading Allowance.~~

843    ~~(iii)  Discharging Port Calls~~

844    ~~If the cargo is discharged during a port call, the Allowed Consumption is the~~
845    ~~Idle Consumption Allowance plus the Discharging Allowance.~~

846    ~~(iv)  Loading and Discharging Port Calls~~

847    ~~If cargo is discharged and loaded during a port call, the Allowed Consumption is the~~
848    ~~Idle Consumption Allowance plus the Discharging Allowance plus the Loading~~
849    ~~Allowance.~~

850    **(f)  Amount Due Charterer**

851    ~~Allowed Consumption minus actual consumption as reported in the Vessel's Sea Log~~
852    ~~equals tons saved or excess tons consumed.~~

853    ~~Excess tons consumed, multiplied by the appropriate price as determined in accordance~~
854    ~~with Clause 9a(2) equals amount due Charterer.~~

## 10 Liens

856    Owner shall have a lien on all cargoes and subfreights for all amounts due under the Charter.
857    Charterer shall have a lien on the Vessel for all monies paid in advance and not earned, all
858    disbursements and advances for Owner's account, including commissions, cost of insurance and
859    expenses thereon, all amounts due to Charterer under the Charter, and for any damages sustained
860    by Charterer or its Affiliates as a result of any breach of the Charter by Owner.  If the Vessel, its
861    bunkers or stores or cargo should be arrested, detained, impounded or otherwise held (**"Detention"**),
862    or if Detention thereof should be threatened, the Owner shall promptly provide such bail or other
863    security as may be required to prevent such Detention or to secure the release of the Vessel, its
864    bunkers, cargo or stores from Detention, and shall indemnify Charterer and its Affiliates in respect of
865    any loss, damage, and costs (including but not limited to attorney/client costs) resulting from Owner's
866    failure to promptly provide such bail or other security as described above.  In addition, should Owner
867    fail to promptly provide bail or other security as described above, Charterer shall have the right to
868    incur such costs on Owner's behalf, but Owner shall remain liable for all indemnity obligations under
869    this Clause.

## 11 Off-Hire

871    **a   General Provisions**

872    (i)   In the event of loss of time from repairs; breakdown of machinery (whether partial or
873          otherwise) including, without limitation, tank coatings; capture or seizure; detention,
874          threatened detention or other interference by authorities, collision, stranding, fire, or other
875          accident or damage to the Vessel or cargo (not caused by the fault of Charterer) preventing,

| 876 | | or which would prevent, the full and efficient working of the Vessel for more than ~~twelve (12)~~ |
| 877 | | ***six (6)*** consecutive hours, or |

| 878 | (ii) | In the event of loss of time (whether or not continuing for any length of time) from deficiency |
| 879 | | of men or stores; breach of orders or neglect of duty by the Master, officers or crew; or from |
| 880 | | the consequences of illness or injury to, or strikes by, or refusal, inability or unwillingness to |
| 881 | | sail or otherwise do work on the part of the Master, officers or crew; or from labor-related |
| 882 | | picketing or boycott due to the Vessel or crew union affiliation or lack thereof, at places of |
| 883 | | loading, discharge, bunkering, or elsewhere by persons or organizations other than the |
| 884 | | Master, officers or crew of the Vessel; or from deviation (which expression includes, without |
| 885 | | limitation, putting back or putting into any port or place other than that to which the Vessel |
| 886 | | was bound under orders from Charterer) for the purpose of obtaining medical advice or |
| 887 | | treatment, or landing any injured, ill or other person, or the body of a deceased person on |
| 888 | | board (other than any person who may be carried at Charterer's request); while saving or |
| 889 | | attempting to save life or property or going to the aid of a ship in distress (whether voluntary |
| 890 | | or not), or |

| 891 | (iii) | ~~In the event of loss of time (taking into account, where appropriate, the three-hour franchise~~ |
| 892 | | ~~in sub-paragraph (i) above) from failure of the Vessel for any reason to fulfill the requirements~~ |
| 893 | | ~~of Clause 2 and/or Clause 4~~; then, |

| 894 | | payment of hire shall cease for all time lost until the Vessel is again in an efficient state to resume |
| 895 | | her service and has regained a point of progress equivalent to that when the hire ceased |
| 896 | | hereunder, including, without limitation, return to the queue position or place occupied by the |
| 897 | | Vessel when the Vessel went off-hire. The cost of fuel consumed while the Vessel is off-hire |
| 898 | | hereunder, as well as all port charges, pilotage, and other expenses incurred during such period |
| 899 | | or consequent to the putting-in to any port or place other than that to which the Vessel is bound, |
| 900 | | shall be borne by Owner; but should the Vessel be driven into port or to anchorage by stress of |
| 901 | | weather or on account of accident to her cargo, such loss of time shall be for Charterer's account. |
| 902 | | If, upon the voyage, the speed of the Vessel is reduced or her fuel consumption is increased by |
| 903 | | breakdown, casualty, or inefficiency of Master, officers, or crew, so as to cause a delay of more |
| 904 | | than eight hours in arriving at the Vessel's next port or an excess consumption of more than one |
| 905 | | day's fuel, hire for the time lost and cost of extra fuel consumed, if any, shall be borne by Owner. |
| 906 | | Any delay by ice or time spent in quarantine shall be for Charterer's account, except delay in |
| 907 | | quarantine resulting from the Master, officers, or crew having communications with the shore at |
| 908 | | an infected port where Charterer has given the Master adequate written notice of infection, which |
| 909 | | shall be for Owner's account, as shall also be any loss of time through detention by authorities as |
| 910 | | a result of charges of smuggling or of other infraction of law by the Master, officers, or crew. |

| 911 | **b** | **Cumulative Off-Hire** |

| 912 | | If the periods of time lost, for which hire does not cease to be payable under the provisions of |
| 913 | | Clause 11a because each such period or delay is not of more than ~~twenty-four (24)~~ ***six (6)*** |
| 914 | | consecutive hours duration, exceed in the aggregate ~~twenty-four (24)~~ ***six (6))*** hours in any charter |
| 915 | | party ***month*** ~~year (and pro rata for part of a year)~~, hire shall not be payable for all time lost during |
| 916 | | such ~~twenty-four (24)~~ ***six (6)*** hour franchise period as well as the excess beyond such period and |
| 917 | | any hire overpaid by Charterer shall be repaid by Owner. ~~The term "charter party year" means~~ |
| 918 | | ~~consecutive periods of one year, with the first commencing on the date of delivery under the~~ |
| 919 | | ~~Charter.~~ |

| 920 | **c** | **Detention of the Vessel** |

| 921 | | In the event of loss of time by detention of the Vessel by authorities at any place in consequence |
| 922 | | of legal proceeding against the Vessel, Owner, Vessel operator, Master and/or crew, or by reason |
| 923 | | of any strike or boycott against the Vessel, payment of charter hire shall cease for all time so lost. |
| 924 | | The cost of fuel consumed as well as all additional port charges, pilotage, and other expenses |
| 925 | | incurred during the time so lost shall be borne by Owner. If any such loss of time shall exceed |
| 926 | | thirty (30) consecutive days, Charterer shall have the option to cancel the Charter by written |

| 927 | notice given to Owner while the Vessel remains so detained, without prejudice to any other right |
| 928 | Charterer may have in the premises. |

929 **d   Owner's Due Diligence**

| 930 | The provisions of the Charter providing for Vessel off-hire and Related Off-Hire Expense, |
| 931 | including, without limitation, Clause 3 and Clause 11, shall be fully operative regardless of any |
| 932 | due diligence Owner may have exercised. |

933 **e   Trading While Off-Hire**

| 934 | Owner may not, under any circumstances, trade the Vessel for its own account during any period |
| 935 | of off-hire. |

936 **f   Reservation**

| 937 | Nothing in Clause 11 shall affect any other provisions of the Charter stipulating loss of time for |
| 938 | Vessel's or Owner's account or otherwise providing for suspension or cessation of hire or other |
| 939 | rights and remedies for loss or diminution of Vessel services under the Charter. |

940 **12  Dry-docking and Repairs**

941 **a   General Provisions**

| 942 | Owner, at its expense, shall dry-dock the Vessel, clean and paint the Vessel's bottom, and make |
| 943 | all overhaul and other necessary repairs at reasonable intervals.  Such overhaul or repair |
| 944 | intervals shall not be less than thirty (30) months and such dry-docking intervals shall not be less |
| 945 | than sixty (60) months unless the Vessel's flag state or classification society requires shorter |
| 946 | intervals.  For the purpose of dry-docking or repair, Charterer shall allow the Vessel to proceed to |
| 947 | an appropriate port.  Owner shall be solely responsible for such dry-docking and repairs, and also |
| 948 | for gas-freeing the Vessel upon each occasion.  All towing, pilotage, fuel, and other expenses |
| 949 | incurred while proceeding to and from and while in and waiting for dry dock or repair shall also be |
| 950 | for Owner's account.  Fuel used during such dry-docking or repair periods, as provided in Clause |
| 951 | 12 or Clause 15, or used in proceeding to or from the port of dry-docking or repair, will be |
| 952 | charged to Owner by Charterer at the price charged to Charterer by its bunker supplier at such |
| 953 | port if bunkers are obtained there, or at the next replenishment port. |

954 **b   Adjustment of Hire**

| 955 | In case of dry-docking or repair pursuant to Clause 12 at a port where the Vessel is to load, |
| 956 | discharge or bunker under Charterer's orders, hire shall be suspended from the time the Vessel |
| 957 | ***arrives at load port*** ~~receives free pratique on arrival~~, if in ballast, or upon completion of |
| 958 | discharge of cargo, if loaded, until the Vessel is again in all respects ready for service.  In case of |
| 959 | dry-docking or repair at a port other than where the Vessel loads, discharges or bunkers under |
| 960 | Charterer's orders, the following time and bunkers shall be deducted from hire:  The total time |
| 961 | and bunkers, including dry-dock or repair port call, for the actual voyage from the last port of call |
| 962 | under Charterer's orders to the next port of call under Charterer's orders, less the theoretical |
| 963 | voyage time and bunkers for the direct voyage from said last port of call to said next port of call. |
| 964 | The theoretical voyage will be calculated on the basis of the sea buoy to sea buoy distance at the |
| 965 | ~~warranted~~ speed and consumption stipulated in Clauses 8a and 8b. |

966 **c   Accumulation of Off-Hire Time**

| 967 | The period during which hire is suspended, including time in and waiting for dry dock and repairs, |
| 968 | until the Vessel again comes on-hire under the terms of Clause 12b shall count as off-hire time |
| 969 | under the terms of the Charter. |

970 **d   Dry-docking Area**

| 971 | When dry-docking or repair is required, the Vessel may only be dry-docked or repaired within the |
| 972 | Vessel's then-current trading pattern or area unless Charterer pre-agrees otherwise in writing. |

973 Owner may not, under any circumstances, trade the Vessel for its own account on the voyage to
974 or from the dry dock or repair location.

975 **e Notices**

976 Except in case of emergency, the Vessel shall not be scheduled for dry-docking in such a manner
977 that it will be unavailable for service to Charterer during the months of December and January
978 without Charterer's written pre-consent. Owner shall give Charterer no less than four (4) months
979 written notice of its intention to dry-dock or repair the Vessel, which notice shall include Owner's
980 estimate of the time required to complete the planned dry-docking or repair. Owner shall also
981 promptly give Charterer written notice if Owner's original estimate of the duration of the dry-
982 docking or repair period changes by more than three days. In any case, Owner shall give no less
983 than ten days written notice of the date for completion of any planned dry-dock or repair, failing
984 which any time thereby lost to Charterer shall be off-hire time.

985 ## 13 Owner Provides

986 **a Owner's Responsibility**

987 Owner shall provide and pay for all provisions, deck and engine room stores, galley and cabin
988 stores, P&I, hull, and other insurance on the Vessel (except as provided for in Clause 6a and
989 Clause 21d), wages of the Master, officers, and crew, all certificates and other requirements
990 necessary to enable the Vessel to be employed throughout the trading limits herein provided,
991 consular fees pertaining to the Master, officers, and crew, all fresh water used by the Vessel, and
992 all other expenses connected with the operation, maintenance, and navigation of the Vessel, and
993 customs or import duties arising in connection with any of the foregoing.

994 **b Wages, Provisions and Stores**

995 Any amounts expended for wages, provisions, and stores (insofar as such amounts are in respect
996 of a period when the Vessel is on-hire) shall not be deemed a general average expenditure.

997 **c Lubricants**

998 When, during the Charter Term, Owner plans to purchase lubricants for the Vessel, Owner shall
999 purchase such lubricants from one of Charterer's associated or affiliated companies whenever
1000 they are available at competitive prices. In the event lower prices are quoted to Owner by any
1001 supplier at the relevant port(s), Owner shall give one of Charterer's associated or affiliated
1002 companies the opportunity to meet such quotation

1003 ## 14 Officers' Duties

1004 **a Master's Duties**

1005 The Master, although appointed by and in the employ of Owner and subject to Owner's direction
1006 and control, shall observe the orders of Charterer in connection with Charterer's agencies,
1007 arrangements, and employment of the Vessel's services hereunder. The Master shall prosecute
1008 all voyages with the utmost dispatch and render all reasonable assistance with the Vessel's crew
1009 and equipment, including, without limitation, hoisting, connecting and disconnecting hoses at
1010 ports or sea-berths when requested or when such assistance is the normal practice. If a conflict
1011 arises between loading or discharge terminal orders and Charterer's orders, Master shall stop
1012 cargo operations and promptly request instructions from Charterer by the fastest available
1013 means. Nothing in Clause 14, or elsewhere in the Charter, shall be construed as creating a
1014 demise of the Vessel to Charterer, nor as vesting Charterer with any control over, or responsibility
1015 for, the management, operation, and/or navigation of the Vessel.

1016 **b Logs**

1017 The Master and the engineers shall timely keep and sign full and correct logs of the voyages,
1018 which are to be patent to Charterer and its agents, and true log abstracts or such other paper or

| 1019 | electronic forms as Charterer may require are to be sent, as instructed, directly to Charterer from |
| 1020 | each port of call. |

**c   Conduct**

| 1022 | If Charterer shall have reason to be dissatisfied with the conduct of the Master, officers or crew, |
| 1023 | Owner shall, on receiving particulars of the complaint, investigate it and, if reasonably required, |
| 1024 | make a change in the appointments. |

## 15 Fuel, Port Charges, Etc.

**a   Fuel, Port Charges, Dues and Fees**

| 1027 | Charterer shall provide and pay for all fuel ***and lubes***.  If Charterer issues orders to the Vessel |
| 1028 | that to the best of Master's knowledge and belief, if followed, would result in the Vessel violating |
| 1029 | the lawful requirements of any emission control area, the Master shall immediately advise |
| 1030 | Charterer of such potential violation and request revised orders or a change of bunkers to permit |
| 1031 | lawful execution of Charterer's original orders.  Owner, at each fueling, shall arrange for and |
| 1032 | retain properly sealed and identified samples of each grade of fuel received and shall hold same |
| 1033 | subject to Charterer's written instructions. |

| 1034 | Charterer shall also pay for all port charges (including the cost of obtaining a certificate of |
| 1035 | arrangements for oil recovery boats or devices at Japanese ports), light dues, dock dues, canal |
| 1036 | dues, pilotage, ***line handlers, agency fees, security costs, taxes in state for revenue,*** |
| 1037 | consular fees (except those pertaining to Master, officers and crew), tugs necessary for assisting |
| 1038 | the Vessel in, about, and out of port for the purpose of carrying out the Charter, Charterer's |
| 1039 | agencies and commissions incurred for Charterer's account and (subject to Charterer's pre- |
| 1040 | approval) any tank cleaning chemicals required by the Vessel to comply with Charterer's voyage |
| 1041 | instructions.  Owner shall, however, reimburse Charterer for any fuel used or any expenses |
| 1042 | incurred in making a general average sacrifice or expenditure, and for any fuel consumed during, |
| 1043 | or related to, dry-docking, repair of the Vessel, or other periods of off-hire and said |
| 1044 | reimbursement(s) shall in no event be deemed a General Average expenditure.  Charterer shall |
| 1045 | nominate and appoint Vessel's agents at all port(s) and place(s).  Such agents shall be paid for |
| 1046 | by Charterer; ~~however, when such agents are providing assistance or services to the Vessel,~~ |
| 1047 | ~~Master, crew or Owner, Owner shall instruct such agents who shall represent solely the Owner~~ |
| 1048 | ~~and Vessel.~~ ***Owner acts as its own agent.*** |

**b   Tugs and Pilots**

| 1050 | ~~In engaging pilotage and tug assistance, Charterer is authorized by Owner to engage them on~~ |
| 1051 | ~~behalf of Owner on the usual terms and conditions for such services then prevailing at the ports~~ |
| 1052 | ~~or places where such services are engaged, including provisions there prevailing, if any, making~~ |
| 1053 | ~~pilots, tug captains, or other personnel of any tug the borrowed servants of Owner.~~ |

| 1054 | Assist tugs and Pilots for Charterers account. |

**c   Charterer's Responsibility**

| 1056 | Neither Charterer, nor its agents, nor any associated or affiliated company of Charterer, nor any |
| 1057 | of their agents, directors, officers, or employees shall be under any responsibility for any loss, |
| 1058 | damage, or liability arising from any negligence, incompetence, or incapacity of any pilot, tug |
| 1059 | captain, or other personnel of any tug, or arising from the terms of the contract of employment |
| 1060 | thereof, or for any unseaworthiness or insufficiency of any tug or tugs, the services of which are |
| 1061 | arranged by Charterer on behalf of Owner, and Owner agrees to indemnify and hold Charterer, its |
| 1062 | agents, its associated and affiliated companies, and their agents, directors, officers and |
| 1063 | employees harmless from and against any and all such consequences. |

1064    ~~d    Charterer's Tugs or Pilots~~

1065    ~~Charterer shall have the option of using its own tugs or pilots, or tugs or pilots made available or~~
1066    ~~employed by any associated or affiliated company, to render towage or pilotage services to the~~
1067    ~~Vessel. In this event, the terms and conditions relating to such services prevailing in the port~~
1068    ~~where such services are rendered and applied by independent tugboat owners or pilots shall be~~
1069    ~~applicable, and Charterer, its associated or affiliated company and its pilots shall be entitled to all~~
1070    ~~exemptions from, and limitations of, liability applicable to said independent tugboat owners or~~
1071    ~~pilots and their published tariff terms and conditions.~~

1072    **e    Exception**

1073    Any and all requirements of the Vessel, whatsoever, during or in connection with periods of off-
1074    hire and during loss of time for Owner's account, whether or not Vessel is off-hire, shall be
1075    provided and/or paid for by Owner, notwithstanding that such requirements would otherwise be
1076    provided for and/or paid for by Charterer under Clause 15.

## 16 Additional Equipment

1078    Charterer, subject to Owner's approval not to be unreasonably withheld, shall be at liberty to fit any
1079    additional pumps and/or gear for loading or discharging cargo or other purposes it may require
1080    beyond that which is on board at the commencement of the Charter, and to make the necessary
1081    connections with steam or water pipes or other systems, such work to be done at its expense and
1082    time, and such pumps and/or gear so fitted to be considered its property, and Charterer shall be at
1083    liberty to remove same at its expense and time during or at the expiry of the Charter; the Vessel to be
1084    left in her original condition to Owner's satisfaction, ordinary wear and tear excepted. Owner shall, at
1085    its expense, provide appropriate maintenance for any equipment installed by Charterer.

## ~~17 Lay-up~~

1087    ~~Charterer shall have the option of laying-up the Vessel for all or any portion of the Charter Term, in~~
1088    ~~which case hire hereunder shall continue to be paid, but there shall be credited against such hire the~~
1089    ~~whole amount which Owner shall save (or reasonably should save) during such period of lay-up~~
1090    ~~through reduction in expenses, less any extra expenses to which Owner is put as a result of such lay-~~
1091    ~~up. The place of such lay-up shall be subject to Owner's approval, not to be unreasonably withheld.~~
1092    ~~Should Charterer, having exercised the option granted hereunder, desire the Vessel to again be put~~
1093    ~~into service, Owner will, upon receipt of written notice from Charterer to such effect, immediately take~~
1094    ~~steps to restore the Vessel to service as promptly as possible. The option granted to Charterer~~
1095    ~~hereunder may be exercised one or more times during the currency of the Charter or any extension~~
1096    ~~thereof.~~

## 18 Requisition of Vessel

1098    **a    Requisition of Title**

1099    In the event that title to the Vessel shall be requisitioned or seized by any government authority
1100    (or the Vessel shall be seized by any person, entity, or government under circumstances that are
1101    equivalent to requisition of title), the Charter shall terminate automatically as of the effective date
1102    of such requisition or seizure.

1103    **b    Other Requisition**

1104    In the event that the Vessel should be requisitioned for use or seized by any government
1105    authority or by any person or entity on any basis not involving or not equivalent to requisition of
1106    title, it shall be off-hire hereunder during the period of such requisition, and any hire or any other
1107    compensation paid in respect of such requisition shall be for Owner's account; provided,
1108    however, that if such requisition continues for a period in excess of sixty (60) days, Charterer
1109    shall have the option to terminate the Charter upon written notice to Owner. Any periods of off-

| 1110 | hire under Clause 18b shall be subject to Charterer's option for off-hire extension set forth in |
| 1111 | Clause 1c. |

## 19 Redelivery

**a  Redelivery Conditions**

1114 Unless the Charter shall previously have been terminated by loss of the Vessel or as otherwise
1115 provided in the Charter or by law, Charterer shall redeliver the Vessel to Owner, free of cargo,
1116 *with segregated clean ballast only, in inerted condition, free of slops* at the expiration of the
1117 Charter Term upon completion of discharge at *Galveston Bar or Southwest Pass, in Owner's*
1118 *option or as otherwise agreed* a port or place, worldwide, in Charterer's option, and shall give
1119 written notice of the date and hour of such redelivery.  In addition, Charterer shall give Owner
1120 written notice of the estimated date of such redelivery 30, 20, 10 and 5 days in advance of same*,*
1121 *and 7/5/3/2/1 days in advance definite notice*.  At Charterer's option, the Vessel may be
1122 redelivered to Owner with tanks in a clean or dirty condition and in no event shall Charterer be
1123 required to redeliver the Vessel gas-free.

**b  Fuel at Redelivery**

1125 Owner shall accept and pay for all fuel in the Vessel's bunker tanks when the Charter terminates.
1126 Payment for such fuel shall be in accordance with the last documented net price paid by
1127 Charterer, excluding any delivery charges.

**c  Early Redelivery**

1129 If the Charter is terminated prior to the expiration of the Charter Term in accordance with any
1130 provision of the Charter or by reason of law, Owner shall reimburse Charterer for the value of any
1131 hire paid but not earned, the value of fuel in the Vessel's bunker tanks at termination in
1132 accordance with Clause 19b, any other sums Charterer is entitled to under the Charter, as well as
1133 any damages Charterer may sustain if termination is due to Owner fault or breach of the Charter.

## 20 Bills of Lading -  *APPLICABLE ONLY FOR VOYAGES GOING TO OR FROM PORTS OUTSIDE THE UNITED STATES*

**a  Signatures**

1137 *On voyages going to or from ports outside the United States,* Bills of Lading shall be signed
1138 by the Master as presented, the Master attending daily, if required, at the offices of Charterer or
1139 its agents.  However, at Charterer's option, Charterer or its agents may sign Bills of Lading on
1140 behalf of the Master.  All Bills of Lading shall be without prejudice to the Charter, and Charterer
1141 shall indemnify Owner against all consequences or liabilities which may arise from any
1142 inconsistency between the Charter and any Bills of Lading or other documents signed by
1143 Charterer or its agents, or by the Master at their request, or which may arise from an irregularity
1144 in papers supplied by Charterer or its agents.

**b  Carriage of Cargo**

1146 Notwithstanding anything in the Charter to the contrary, the carriage of cargo under the Charter
1147 and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and
1148 other terms set forth or specified in Clauses 20b(1) through 20b(6) and such terms shall be
1149 incorporated verbatim, or be deemed incorporated by reference, in any such Bill of Lading.  In
1150 such Clauses and in any Act referred to therein, the word "Carrier" shall include Owner and any
1151 chartered owner of the Vessel.

**(1)  Clause Paramount**

1153 This Bill of Lading shall have effect subject to the provisions of the United Nations Convention
1154 on Contracts for the International Carriage of Goods Wholly or Partly by Sea, adopted 11

1155 ~~December 2008 ("**Rotterdam Rules**") , except that if this~~ *If the* Bill of Lading is issued at a
1156 place where any other act, ordinance, or legislation gives statutory effect to:

1) the Carriage of Goods by Sea Act of the United States, approved April 16, 1936
("**COGSA**"), *or*

2) the International Convention for the Unification of Certain Rules relating to Bills of Lading
at Brussels, 15th August 1924 ("**Hague Rules**"), or

3) the Hague Rules as amended by the Protocol signed at Brussels on 23rd February 1968
("**Hague/Visby Rules**"), or

4) the United Nations Convention on the Carriage of Goods by Sea 1978 ("**Hamburg
Rules**"),

5) *the United Nations Convention on Contracts for the International Carriage of
Goods Wholly or Partly by Sea, adopted 11 December 2008 ("Rotterdam Rules"),*

1167 then this Bill of Lading shall have effect subject to the provisions of such act, ordinance, or
1168 legislation.  The applicable act, ordinance, or legislation ("**Act**") shall be deemed to be
1169 incorporated herein and nothing herein contained shall be deemed a surrender by the Carrier
1170 of any of its rights or immunities or an increase of any of its responsibilities or liabilities under
1171 the Act.  If any term of this Bill of Lading be repugnant to the Act to any extent, such term
1172 shall be void to that extent but no further.

**(2) Jason Clause**

1174 In the event of accident, danger, damage or disaster before or after the commencement of
1175 the voyage, resulting from any cause whatsoever, whether due to negligence or not, for
1176 which, or for the consequences of which, the Carrier is not responsible, by statute, contract or
1177 otherwise, the cargo shippers, consignees, or owners of the cargo shall contribute with the
1178 Carrier in General Average to the payment of any sacrifices, losses, or expenses of a
1179 General Average nature that may be made or incurred and shall pay salvage and special
1180 charges incurred in respect of the cargo.  If a salving ship is owned or operated by the
1181 Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to
1182 strangers.  Such deposit as the Carrier or its agents may deem sufficient to cover the
1183 estimated contribution of the cargo and any salvage and special charges thereon shall, if
1184 required, be made by the cargo shippers, consignees or owners of the cargo to the Carrier
1185 before delivery.

**(3) General Average**

1187 General Average shall be adjusted, stated, and settled according to York-Antwerp Rules
1188 2004 ("**Rules**") and, as to matters not provided for by those Rules, according to the laws and
1189 usage at the port of New York; provided that, when there is an actual escape or release of oil
1190 or pollutant substances from the Vessel (irrespective of Vessel location), the cost of any
1191 measures, continued or undertaken on that account, to prevent or minimize pollution or
1192 environmental damage shall not be allowable in General Average; and, provided further, that
1193 any payment for pollution damage (as defined in Article I 6.(a) of the 1992 Protocol to the
1194 International Convention on Civil Liability for Oil Pollution Damage) shall also not be
1195 allowable in General Average.  It is understood and agreed, however, that the cost of
1196 measures to prevent pollution or environmental damage, undertaken in respect of oil or
1197 pollutant substances which have not escaped or been released from the Vessel, shall be
1198 included in General Average to the extent permitted by the Rules.  If a General Average
1199 statement is required, it shall be prepared at such port by an Adjuster from the port of New
1200 York appointed by the Carrier and approved by Charterer of the Vessel.  Such Adjuster shall
1201 attend to the settlement and the collection of the General Average, subject to customary
1202 charges.  General Average Agreements and/or security shall be furnished by Carrier, and/or
1203 Charterer, and/or Owner, and/or Consignee of the cargo, if requested.  Any cash deposit
1204 being made as security to pay General Average and/or salvage shall be remitted to the

| 1205 | Average Adjuster and shall be held by the Adjuster's risk in a special account |
| 1206 | in a duly authorized and licensed bank at the place where the General Average statement is |
| 1207 | prepared. |

| 1208 | **(4) Both to Blame** |

| 1209 | If the Vessel comes into collision with another ship as a result of the negligence of the other |
| 1210 | ship and any act, neglect or default of the Master, mariner, pilot, or the servants of the Carrier |
| 1211 | in the navigation or in the management of the Vessel, the owners of the cargo carried |
| 1212 | hereunder shall indemnify the Carrier against all loss or liability to the other or non-carrying |
| 1213 | ship or its owners insofar as such loss or liability represents loss of, or damage to, or any |
| 1214 | claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by |
| 1215 | the other or non-carrying ship or its owners as part of their claim against the carrying ship or |
| 1216 | Carrier. The foregoing provisions shall also apply where the owners, operators, or those in |
| 1217 | charge of any ships or objects other than, or in addition to, the colliding ships or objects are at |
| 1218 | fault in respect of a collision or contact. The provisions in this Clause 20b(4) shall only apply |
| 1219 | if Owner has exercised due diligence to make the Vessel seaworthy and properly manned, |
| 1220 | equipped, and supplied, with the burden of proof in this regard resting solely on Owner. |

| 1221 | **(5) Limitation of Liability** |

| 1222 | Notwithstanding any provision of the Charter to the contrary, the Carrier shall have the |
| 1223 | benefits of all limitations of, and exemptions from, liability accorded to the owner or chartered |
| 1224 | owner of vessels by any statute or rule of law for the time being in effect. |

| 1225 | **(6) Deviation Clause** |

| 1226 | Subject to Clause 11, the Vessel shall have liberty to sail with or without pilots, to tow or be |
| 1227 | towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life |
| 1228 | or property or of landing any ill or injured person on board, and to call for fuel at any port or |
| 1229 | ports in or out of the regular course of the voyage. |

| 1230 | **c   Bill of Lading Indemnity** |

| 1231 | If Charterer requests Owner to deliver cargo at a discharge port or place either: |

| 1232 | 1)   Without prior presentation to the Vessel at the discharge port or place of one of the original |
| 1233 |       Bills of Lading issued for the cargo, duly endorsed, and/or |

| 1234 | 2)   At a discharge port or place other than that specifically named in said Bills of Lading, |

| 1235 | Owner shall deliver the cargo in accordance with Charterer's request if Charterer first executes |
| 1236 | and delivers a written indemnity *as per International Group Rules and wording* in connection |
| 1237 | with such delivery in favor of Owner, Vessel, any chartered owner(s) of Vessel, Master, Vessel |
| 1238 | operators, agents and underwriters and delivers such indemnity to Owner or Owner's designee. |
| 1239 | The subject indemnity shall meet the requirements of Clause 20d and shall be limited in value to |
| 1240 | two hundred percent (200%) of the CIF value of the cargo so delivered. |

| 1241 | **d   Form of Indemnity** |

| 1242 | The indemnity referred to in Clause 20c shall be a short form indemnity document incorporating |
| 1243 | the terms and conditions set forth in Clause 20e. This document (which must be properly filled- |
| 1244 | in) shall be given to Owner by electronic mail, telex, letter, or facsimile as requested by Owner |
| 1245 | and be in the exact form quoted below, which document, when transmitted, shall be deemed to |
| 1246 | have been signed by person acting on behalf of Charterer: |

| 1247 | *QUOTE* |

| 1248 | Time Charter of M.T. *[Insert the vessel name]* dated *[Insert the date of the charter party]* between |
| 1249 | *[Insert the name of Owner]*, as Owner ("Owner") and *[Insert the name of Charterer]*, as Charterer |
| 1250 | ("Charterer"). |

1251 Reference is made to the cargo ("Cargo") now laden aboard the above Vessel ("Vessel").
1252 Pursuant to Clause 20c of the above-captioned charter party ("Charter"), the undersigned
1253 requests that Owner(s) of the Vessel deliver the Cargo at _____ unto _____
1254 without prior discharge site presentation to the Vessel of all original Bills of Lading issued for the
1255 Cargo appropriately endorsed for such delivery and/or at a discharge port or place other than one
1256 specifically named in said Bills of Lading.

1257 In consideration of such delivery, the undersigned hereby gives an indemnity containing the terms
1258 set forth in Clause 20e of the Charter ("Indemnity Terms and Conditions"). The Indemnity Terms
1259 and Conditions are deemed incorporated in and made a part of this document. The term
1260 "Indemnifier" in the Indemnity Terms and Conditions shall be deemed to refer to the undersigned.
1261 The term "Cargo" and the phrase "Requested Delivery" in the Indemnity Terms and Conditions
1262 shall be deemed, respectively, to mean the Cargo and the delivery request set forth in the
1263 preceding paragraph of this document. The term "Ship" as used in the Indemnity Terms and
1264 Conditions shall be deemed to refer to the Vessel. The following information must be provided:

1265 Name of Charterer: _____

1266 Name of Person Acting on Behalf of Charterer: _____

1267 Authority/Title of Above Person: _____

1268 Date Indemnity Given: _____

1269 *UNQUOTE*

1270 **e    Indemnity Terms and Conditions**

1271 **(1)  Nature of Indemnity**

1272 Indemnifier shall indemnify and hold harmless the Owner of the Ship, any chartered Owner of
1273 the Ship, the Ship operator, the Ship Master, the Ship underwriters and the Ship agents
1274 (hereinafter jointly and individually called **"Indemnitees"**) in respect of any liability, loss,
1275 damage, costs (including, but not limited to attorney/client costs) and other expense of
1276 whatever nature which Indemnitees may sustain or incur by reason of the Requested
1277 Delivery.

1278 **(2)  Funds for Defense**

1279 In the event of any legal action or proceedings being commenced against the Indemnitees in
1280 connection with the Requested Delivery, Indemnifier shall provide Indemnitees from time to
1281 time, on Indemnitees' demand, with sufficient funds to defend the same.

1282 **(3)  Arrest or Detention**

1283 If the Ship or any other vessel or other property belonging to the Indemnitees should be
1284 arrested or detained or if the arrest or detention thereof should be threatened for any claim in
1285 connection with the Requested Delivery, the Indemnifier shall provide, upon demand of the
1286 Indemnitees, such bail or other security as may be required to prevent such arrest(s) or
1287 detention(s) or to secure the release of the Ship or such vessel or other property from arrest
1288 or detention, and shall indemnify the Indemnitees in respect of any loss, damage, costs
1289 (including but not limited to attorney/client costs), and other expense resulting from such
1290 arrest or detention or threatened arrest or detention, whether or not the same may be
1291 justified, and to pay to the Indemnities, on the Indemnitees' demand, the amount of such loss,
1292 damages, costs and/or expense.

1293 **(4)  Termination of Indemnity**

1294 This Indemnity shall automatically become null and void, and Charterer's liability hereunder
1295 shall cease, upon presentation of all original Bills of Lading duly endorsed to reflect delivery
1296 of Cargo in accordance with the Requested Delivery, or upon the expiration of thirty-six (36)
1297 months after completion of discharge, whichever occurs first; provided that no legal

| 1298 | proceedings arising from delivery of the Cargo in accordance with the Requested Delivery |
| 1299 | have been instituted against the Indemnitees and/or Vessel within such thirty-six (36) month |
| 1300 | period. Owner shall advise Charterer with reasonable dispatch in writing if any proceedings |
| 1301 | are instituted. |

**(5) Governing Law**

1302

1303 The within Indemnity shall be governed and construed in accordance with the internal
1304 substantive laws of the State of New York, U.S.A. The Indemnitees may, but shall not be
1305 obligated to, bring any legal action or proceeding with respect to such Indemnity in the Courts
1306 of the State of New York, U.S.A. or in the U.S. Federal Court situated therein and the
1307 Indemnifier unconditionally and generally accepts in regard to such legal action or
1308 proceeding, for itself and its property, the jurisdiction and venue of the aforesaid courts.

1309 **f Arbitration of Bill of Lading Claims –** *APPLICABLE ONLY FOR VOYAGES GOING*
1310 *TO OR FROM PORTS OUTSIDE THE UNITED STATES*

1311 Any claim for loss, damage and/or non delivery of cargo carried pursuant to the Charter, made by
1312 any associated or affiliated company of Charterer and asserted to arise under Bill(s) of Lading
1313 issued for such cargo, shall be subject to Clause 29 of the Charter, said associated or affiliated
1314 company having authorized Charterer to so agree on its behalf. If Clause 20f applies, the terms
1315 "Charterer" and "Charter" in Clause 29 shall be taken to mean, respectively, the aforementioned
1316 associated or affiliated company and Bill(s) of Lading.

1317 ## 21 War Risks

1318 **a Contraband**

1319 No contraband of war shall be shipped, but petroleum and/or it products shall not be deemed
1320 contraband of war for the purposes of Clause 21.

1321 **b War Zones**

1322 The Vessel shall not, however, be required, without the consent of Owner, which shall not be
1323 unreasonably withheld, to enter any port, place, or zone that is involved in a state of war, warlike
1324 operations or hostilities, civil strife, terrorism and other politically motivated activities, or piracy,
1325 whether there be a declaration of war or not, where it might reasonably be expected to be subject
1326 to capture, seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning
1327 any de jure or de facto authority or any other purported governmental organization maintaining
1328 naval, military or air forces or any terrorist group or organization).

1329 **c War Risks Insurance**

1330 For purposes of Clause 21, it shall be unreasonable for Owner to withhold consent to any voyage,
1331 route, or port or place of loading or discharge if insurance against all risks defined in Clause 21b
1332 is then available commercially or under a government program in respect to such voyage, route,
1333 or port or place of loading or discharge. If such consent is given by Owner, Charterer shall pay
1334 the reasonable and provable cost of insuring the Vessel against hull war risks in an amount equal
1335 to the insured value under its ordinary hull policy but not exceeding *[Bouchard hull value which*
1336 *not be disclosed.* In addition, Owner may purchase war risks insurance on ancillary risks such
1337 as loss of hire, freight disbursements, total loss, etc., if it carries such insurance for ordinary
1338 marine hazards. Subject to the just-mentioned total insurance limitation of the *Hull Value*. U.S.
1339 dollars, the provable costs of such ancillary insurance shall be for Charterer's account. If such
1340 insurance is not obtainable commercially or through a government program, the Vessel shall not
1341 be required to enter or remain at any such port, place, or zone. Owner shall obtain from insurers
1342 a waiver of any subrogated rights against Charterer and its associated and affiliated companies
1343 and their agents, directors, officers and employees in respect of any claims under the war risks
1344 insurance arising out of Owner's compliance with Charterer's orders.

1345      **d   Additional Costs**

1346      In the event of the existence of the conditions described in Clause 21b subsequent to the date of
1347      the Charter, or while Vessel is on hire under the Charter, Charterer shall, in respect of voyages to
1348      any such port, place or zone, assume any provable additional cost of wages and crew war bonus
1349      and insurance properly incurred in connection with Master, officers and crew as a consequence
1350      of such war, warlike operations or hostilities over and above such costs in effect on the date of
1351      the Charter.

1352      **e   Hostile Areas**

1353      Owner shall have the option of adjusting the timing, speed, and routing of the inward and outward
1354      passage through areas of hostility depending on the prevailing pattern of hostilities. Owner shall
1355      keep Charterer advised of its plans to transit areas of hostilities including any changes while in
1356      transit. The voyage instruction procedures for the Vessel to transit a hostile area(s) shall be as
1357      follows:

1358      Charterer issues voyage instructions directly to the Vessel, with a copy to Owner.

1359      Charterer's voyage instructions should include:

1360      1)   specific ports to load/discharge and sequence of port calls

1361      2)   required load/discharge dates

1362      3)   cargo grades and quantities

1363      4)   bunkering details

1364      5)   cargo measurement and documentation requirements, etc.

1365      Charterer's voyage instructions to include advice to the Master that the specific sailing
1366      instructions for the passage in and out and through the area of hostilities will be issued by Owner.

1367      Owner, upon receipt of Charterer's voyage instructions, shall determine the level and nature of
1368      risk in the hostile area(s) and issue specific cautionary sailing instructions directly to the Vessel
1369      with copy to Charterer's office on an urgent basis.

1370      Owner's specific cautionary sailing instructions shall include passage timing, recommended
1371      routing, speed in and out and through the area(s) of hostilities, and other specific cautionary
1372      instructions.

1373      ## 22 Exceptions

1374      **a   Loss, Damage, Delay**

1375      The Vessel, Master and Owner shall not, except as a result of Clause 20b(1) or as otherwise
1376      expressly provided in the Charter, be responsible for any loss or damage to cargo arising or
1377      resulting from: any act, neglect, default or barratry of the Master, pilots, mariners or other
1378      servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the
1379      personal design or neglect of Owner; collision, stranding, or peril, danger or accident of the sea or
1380      other navigable waters; or from explosion, bursting of boilers, breakage of shafts, or any latent
1381      defect in hull, equipment or machinery.

1382      Neither the Vessel, the Master or Owner, nor Charterer, shall, unless otherwise expressly
1383      provided in the Charter, be responsible for any loss or damage or delay or failure in performing
1384      hereunder arising or resulting from: act of God; act of war; perils of the sea; act of public
1385      enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people, or seizure
1386      under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or
1387      lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or
1388      civil commotion.

b **Number of Grades**

The Owner warrants the Vessel is constructed and equipped to carry *Three (3) grades* within the Vessel's natural segregations. If for any reason the Vessel, upon arrival at a loading port or place, is unable to load the required number of grades, Charterer will do its utmost to provide a suitable cargo consistent with the Vessel's capabilities, with any delay being for Owner's account. However, if such cargo cannot be provided within a reasonable time the Vessel is to proceed to the nearest repair port in ballast and there make all necessary repairs, any time and expense being for Owner's account.

c **Limitation of Exceptions**

The exceptions stated in Clause 22a shall not affect Owner's undertakings with respect to the condition, particulars and capabilities of the Vessel, the provisions for payment and cessation of hire, the obligations of the Owner under Clause 20 in respect of the loading, handling, stowage, carriage, custody, care, and discharge of cargo in the Charter, and/or Charterer's option(s) to terminate the Charter in accordance with the Charter terms.

## 23 Salvage

All salvage moneys earned by the Vessel shall belong to Owner.

## 24 ITOPF

Owner warrants that it is a member of the International Tanker Owners' Pollution Federation (**"ITOPF"**) and that Owner will retain such membership during the Charter Term.

## ~~25 Clean Seas~~

~~Owner agrees to participate in Charterer's program covering oil pollution avoidance (**"Program"**). Such Program requires compliance with latest International Maritime Organization (**"IMO"**) and Port State regulations. The Program prohibits discharge overboard of all oil and all oily water, oily ballast or oil in any form unless in compliance with IMO and Port State local regulations or under extreme circumstances whereby the safety of the Vessel, cargo, or life at sea would be imperiled. Owner shall ensure that the Vessel's personnel comply with the following:~~

~~a **Retention of Residues**~~

~~Subsequent to the date of delivery, and in the course of the ballast passage before presenting for delivery hereunder, any oily residues remaining in the Vessel from its previous cargoes shall be retained on board and shall be handled according to Charterer's instructions.~~

~~b **Tank Washings**~~

~~During tank washing, the tank washings shall be collected into one cargo compartment and, after maximum separation of free water, such free water shall be discharged overboard to the extent permitted by applicable regulations. Thereafter, Charterer shall be notified promptly by electronic mail, facsimile, or telex of the estimated quantity of the segregated tank washings and the type and source of such washings. If Charterer requires that demulsifiers shall be used for the separation of oil and water, such demulsifiers shall be obtained by Owner and paid for by Charterer. When specifically requested by Charterer (e.g., for third-party re-lets), Owner shall ensure that the Master, on the Vessel's arrival at the loading port(s) or place(s) during the Charter does the following:~~

~~1) Arranges for the measurement of the segregated tank washings in conjunction with the cargo supplier(s).~~

~~2) Records the quantity of tank washings so measured in the Vessel's ullage record.~~

| 1432 | | 3) | ~~Issues a Slop Certificate.~~ |
|---|---|---|---|
| 1433 | | 4) | ~~Arranges that the Slop Certificate and/or Vessel's ullage record be duly signed by the cargo~~ |
| 1434 | | | ~~supplier(s) and promptly sent to Charterer.~~ |

~~**c  Disposition of Residues**~~

~~The segregated tank washings and any other oily cargo residues on board ("**Residues**") shall, at Charterer's option, be pumped ashore into slop facilities at the loading port(s) or place(s), commingled with the cargo to be loaded, or segregated from the cargo to be loaded.  If Charterer requires the Master to discharge the Residues at facilities at loading port(s) or place(s), the cost of such facilities and the ultimate disposal of the Residues shall be for Charterer's sole account. If Charterer requires Residues to be kept separate from the cargo to be loaded, such Residues shall, at Charterer's option, be discharged at the discharging port(s) or place(s) in accordance with Charterer's instructions.~~

~~**d  Additional Pollution Prevention Measures**~~

~~1)  Owner will also arrange for the Vessel to adhere to Charterer's Program covering oil pollution avoidance during off-hire periods within the Charter Term, including the preparation of cargo tanks for dry-docking and repairs.~~

~~2)  The Vessel will take all necessary precautions while loading and discharging cargo or bunkers, as well as ballast, to ensure that no oil will escape overboard.~~

~~3)  Nothing in Charterer's instructions shall be construed as permission to pollute the sea by the discharge of oil or oily water, etc.~~

~~4)  The Vessel shall have a safe and efficient means of transferring engine room and pump room bilge liquids to designated holding tanks onboard, for disposal in accordance with international, flag state, and port state regulations.~~

~~5)  Pump room stripping line overboard discharges shall be suitably blanked off before arriving in port.  Such blanks are to be installed and retained in the lines throughout the entire period that the Vessel is in coastal waters.~~

## 26 Cargo Measurement

### a  Measurement and Sampling Requirements

All measurement and sampling procedures shall be performed in accordance with the latest published Manual of Petroleum Measurement Standards issued by the American Petroleum Institute or similar standards issued by the American Society of Testing and Materials.

### b  Loading Requirements

Prior to loading, the Master shall measure the on board quantities of oil, water and sediment residues that are segregated in all holding tanks and slop tanks and those that remain in cargo tanks and, if requested, shall advise supplier(s) and Charterer of such quantities.  After loading, the Master shall determine the cargo quantities loaded, expressing these cargo quantities in barrels at standard temperature (60° F) and performing such calculations in accordance with Clause 26a.  A written tank-by-tank ullage report containing all measurements of oil, water and sediment residues on board prior to loading and quantities of cargo loaded shall be prepared and promptly submitted by the Master to Charterer.

### c  Letter of Protest

If the Master's calculations of cargo loaded (oil, water and sediment residues on board excluded), after applying the Vessel's Experience Factor (**"VEF"**), show any deficiency from the Bill of Lading figures, the Master shall, if investigation and recalculation verify such deficiency, issue a Letter of Protest to supplier(s) (which should, if practicable, be acknowledged) and shall

1477    immediately advise Charterer of such deficiency by electronic mail, telex or radio and thereafter
1478    shall send a copy of the Letter of Protest to Charterer. The Vessel shall have on board sufficient
1479    historical information for the calculation of a VEF using the latest edition of the API MPMS. The
1480    Master shall calculate and apply the VEF, as so determined, during all loadings.

1481    **d**    **Discharging Requirements**

1482    Prior to discharging, the Master shall measure the quantity of each grade of cargo on board,
1483    expressing these quantities in barrels at standard temperature (60°F), using the same calculation
1484    procedures specified in Clause 26a. Before and after discharging, the Master shall cooperate
1485    with shore staff to ascertain discharged quantities. The Vessel shall be obliged to discharge all
1486    liquid oil and, if ordered by Charterer, any residues of oil, water and sediment. The Vessel's just-
1487    mentioned obligation shall not in any way be qualified or limited by any purported "custom of the
1488    trade" that is based on a deemed in-transit loss and that, otherwise, could excuse the Vessel
1489    from failure to discharge all liquid cargo and residues.

1490    **e**    **Inspection**

1491    Charterer may employ an inspector, at its expense, to verify the quantities and qualities of cargo
1492    and residues on board the Vessel at both loading and discharging port(s) and/or place(s). If the
1493    Vessel is equipped with an Inert Gas System, depressurization of tanks to permit ullage
1494    measurements shall be allowed in accordance with the provisions of the most recent Inert Gas
1495    Systems of Oil Tankers publication issued by the IMO.

## 27 Insurance Costs and Liability Levels

1497    **a**    **Insurance Required**

1498    Owner warrants that, throughout Vessel's service under the Charter, Owner shall have full and
1499    valid Protection and Indemnity Insurance (**"P&I Insurance"**) for the Vessel, as described in
1500    Clause 27b, with the P&I Insurance placed with a Protection and Indemnity Club (**"P&I Club"**)
1501    that is a Member of the International Group of P&I Clubs (**"International Group"**). This P&I
1502    Insurance shall be at no cost to Charterer except as otherwise provided in Clause 27c and
1503    Clause 27e.

1504    **b**    **Liability Coverage**

1505    The P&I Insurance must include coverage against liability for cargo loss/damage and against
1506    liability for pollution (**"Pollution Liability"**) in the maximum coverage amount(s) per incident for
1507    each of the foregoing categories of liability as made available by any P&I Club in the International
1508    Group at the commencement of each policy year or other applicable period of coverage during
1509    the Charter Term (but only US$ 1,000 million (one billion dollars) per incident cover for Pollution
1510    Liability is required if such cover is available from a P&I Club). All administrative expenses
1511    incurred by Owner in placing and/or changing P&I Insurance coverages in order to comply with
1512    Clause 27 shall be for Owner's sole account.

1513    **c**    **Surcharge Costs**

1514    Charterer shall, except as otherwise provided in Clause 27, reimburse Owner for any
1515    documented net surcharges properly due and paid by Owner under the P&I Insurance for U.S.
1516    voyages directed under the Charter by Charterer; provided, however, that any reimbursement
1517    obligation of Charterer shall be conditioned upon Owner fully meeting the requirements of Clause
1518    4j. Any request by Owner for reimbursement under Clause 27c shall be submitted to Charterer,
1519    along with appropriate supporting documentation, on a quarterly basis. The phrase "net
1520    surcharges" as used in Clause 27c shall mean the surcharges, as described above, paid by
1521    Owner after taking into consideration any and all discounts and/or rebates received or receivable
1522    by Owner, or to Owner's credit under the P&I Insurance (**"Net Surcharges"**).

#### d Increased Costs

US$ 1,000 million (one billion dollars) per incident coverage for Pollution Liability under P&I Insurance (**"Insurance Coverage"**) is currently available in accordance with Clause 27b. Notwithstanding anything to the contrary in the Charter, Charterer's maximum liability for Net Surcharges shall be limited in amount to the highest Net Surcharges cost (**"Maximum Surcharge Cost"**) under the Insurance Coverage paid by Owner in the Charter term during the last availability of such Insurance Coverage to Owner in accordance with Clause 27b. If the amount of the Net Surcharges increases above the Maximum Surcharge Cost, the amount of such increase (**"Increased Surcharge Cost"**) shall be for Owner's sole account, subject, however, to Clause 27e. If Owner is required, under Clause 27b, to obtain coverage for Pollution Liability under P&I Insurance in excess of US$ 1,000 million (one billion dollars) per incident and the net cost to Owner of such coverage — aside from any surcharge cost — is greater than the net cost to Owner that was applicable under the Insurance Coverage in the Charter Term during the last availability of such Insurance Coverage to Owner in accordance with Clause 27b, this additional net cost (**"Additional Non-surcharge Cost"**) shall be borne solely by Owner, subject, however, to Clause 27e.

#### e Negotiation of Increased Costs

If Owner incurs Increased Surcharge Cost and/or Additional Non surcharge Cost (**"Cost(s)"**) and finds payment thereof burdensome, then Owner may call in writing for negotiations with Charterer with respect to Owner's payment of such Cost(s). In the event Owner so calls for negotiations and there is no agreement reached with respect to such Cost(s) in writing between Owner and Charterer within sixty (60) days after Owner calls for such negotiations, Owner may, upon written notice to Charterer, terminate the Charter effective when the Vessel is cargo free, without liability on either party except for sums, if any, owed by either party under the Charter as of the date of Vessel redelivery; provided, however, that if negotiations are so called for by Owner and agreement is not reached as aforesaid, Charterer shall have the option, at its sole discretion, to either pay the subject Cost(s) or provide a reasonable alternative thereto, in which case Owner shall have no right to terminate the Charter under Clause 27e. Any payment by Charterer, or provision of an alternative to payment with respect to specific Cost(s), shall not be deemed an agreement by Charterer to pay any other, or future, Increased Surcharge Cost and/or Additional Non surcharge Cost.

#### f Notice to Charterer

Owner shall give Charterer timely written notice of all pertinent details in connection with any renewal or new placement of P&I Insurance required by Clause 27, failing which any reimbursement obligation of Charterer under Clause 27 shall cease.

#### g Lapse of Coverage(s)

If required by Charterer, Owner shall, as soon as is reasonably possible, furnish to Charterer such evidence of the insurance(s) required under Clause 27 as Charterer may reasonably request. If there is a failure or lapse of such insurance(s) for any reason (**"Non Coverage"**) at any time during the Charter term, Charterer shall have the option on written notice to Owner to terminate the Charter when the Vessel is cargo-free, or to procure replacement insurance(s) with the same or different underwriters and/or P&I Club chosen by Charterer, with all cost to be borne by Owner, which cost may, at Charterer's option, be invoiced to Owner for payment or be deducted from hire or other sums due Owner under the Charter. The Vessel shall be off-hire from the time of the Non Coverage until full reinstatement of the insurance(s) or termination of the Charter by Charterer. A termination or failure to terminate the Charter in accordance with Clause 27g shall be without prejudice to any claims for damages that Charterer may have by reason of Owner's fault for Non Coverage.

*B NO. 240 and M/V BARBARA E. BOUCHARD* Time Charter dated *[ March 27, 2019]*

1571 ~~**h TOPIA / STOPIA 2006**~~

1572 ~~Owner warrants that it is a Participating Owner and that the Vessel is entered in the Tanker Oil~~
1573 ~~Pollution Indemnification Agreement 2006 ("**TOPIA 2006**") and shall so remain during the~~
1574 ~~Charter Term, provided always that: i) the Vessel meets the definition of a "ship" under the 1992~~
1575 ~~International Convention on Civil Liability for Oil Pollution Damage (1992 CLC) or any amendment~~
1576 ~~thereto and ii) TOPIA 2006 is not terminated in accordance with cl. IX of that agreement.~~
1577 ~~Additionally, if the Vessel has a gross tonnage of 29,548 or less, Owner warrants that it is a~~
1578 ~~Participating Owner and that the Vessel is entered in the Small Tanker Oil Pollution~~
1579 ~~Indemnification Agreement 2006 ("**STOPIA 2006**") and shall so remain during the Charter Term,~~
1580 ~~provided always that: i) the Vessel meets the definition of a "ship" under the 1992 International~~
1581 ~~Convention on Civil Liability for Oil Pollution Damage (1992 CLC) or any amendment thereto and~~
1582 ~~ii) STOPIA 2006 is not terminated in accordance with cl. IX of that agreement. As used in this~~
1583 ~~Clause 27h, the term "Participating Owner" has the definition ascribed to it in TOPIA 2006 and/or~~
1584 ~~STOPIA 2006, as the case may require.~~

1585 **i Certificate(s) of Financial Responsibility**

1586 Owner shall obtain and maintain, at its expense, any required certificate(s) of financial
1587 responsibility ("**COFR**") for trading within the agreed trading range. However, Charterer shall
1588 reimburse Owner for the documented costs of any "per-voyage" charges required under any such
1589 COFR arrangements, and incurred due to Charterer's orders, up to US$ 2500 per port call for up
1590 to ten port calls per P&I Club policy year.

## 28 Parent Guaranty and Change of Ownership

1592 **a Parent Guaranty**

1593 If required by Charterer, Owner shall cause its parent company (or companies) to execute and
1594 deliver to Charterer a written Guaranty in the form shown at 0. Such executed written Guaranty
1595 shall be delivered to Charterer concurrent with Owner's signing of the Charter.

1596 **b Restrictions on Transfer**

1597 Owner's rights and obligations under the Charter are not transferable by sale or assignment
1598 without Charterer's written pre-consent. During the Charter Term, Owner shall not offer the
1599 Vessel for sale to a non-affiliated buyer without Charterer's pre-consent. In the event of the
1600 Vessel being sold, the Charter being assigned, or the Vessel being offered for sale to a non-
1601 affiliated company without such consent, then in addition to its other rights, including, without
1602 limitation the right to claim damages, Charterer may, at its absolute discretion, either place the
1603 Vessel off-hire until Charterer is satisfied that the transfer will have no adverse impact upon
1604 Charterer and its use of the Vessel or terminate the Charter.

## 29 Arbitration

1606 Any and all differences and disputes of whatsoever nature arising out of the Charter shall be put to
1607 arbitration in *American Arbitration in* the city of New York, pursuant to the laws relating to arbitration
1608 there in force, before a board of three persons, consisting of one arbitrator to be appointed by Owner,
1609 one by Charterer, and one by the two so chosen. The decision of any two of the three on any point or
1610 points shall be final. Until such time as the arbitrators finally close the hearing, either party shall have
1611 the right by written notice served on the arbitrators and on the other party to specify further disputes
1612 of differences under the Charter for hearing and determination. The arbitrators may grant any relief
1613 which they, or a majority of them, deem just and equitable and within the scope of the agreement of
1614 the parties, including, but not limited to, specific performance. Awards, made pursuant to Clause 29
1615 may include costs, including a reasonable allowance for attorney's fees, and judgment may be
1616 entered upon any award made hereunder in any court having jurisdiction in the premises.

## 30 Assignment and Sublet

Notwithstanding any other provisions of the Charter, Charterer may assign all of its rights and obligations under the Charter to any of Charterer's associated or affiliated companies, which associated or affiliated company shall be solely responsible for the due fulfillment of this Charter in all terms and conditions. Charterer shall also have the right to sublet the vessel *to an oil company or trading company but never to a direct competitor of Owner (Bouchard)* but, in the event of a sublet, Charterer shall always remain responsible for the fulfillment of the Charter in all its terms and conditions.

## 31 Business Policy

Owner agrees to comply with all laws and lawful regulations applicable to any activities carried out in the name, or otherwise on behalf, of Charterer under the provisions of the Charter. Owner agrees that all financial statements, billings and reports rendered by Owner to Charterer, as provided for in the Charter, shall, in reasonable detail, accurately and fairly reflect the facts about all activities and transactions handled for the account of Charterer.

## 32 Interpretation and Law

The interpretation of the Charter and the rights and obligations of the parties hereto shall be governed by the Federal Maritime Law of the United States and, where applicable, by the Law of the State of New York. The headings of Clauses and paragraphs are for convenience of reference only and shall not affect the interpretation of the Charter. As used throughout the Charter, the terms "trade" and/or "trading" shall mean the loading, and/or transporting, and/or discharging of cargoes designated by Charterer. The loading of bunkers, rotating crew, seeking shelter, and/or other similar or related activities of Owner shall not constitute "trade" or "trading" under the Charter. As used throughout the Charter, the term "place" shall mean terminals, berths, docks, anchorages, submarine pipelines, sea islands, buoys, alongside other vessels and/or lighters (whether at anchor or underway), and/or any other location whatsoever to which Charterer is entitled to order the Vessel. The options granted to Charterer to cancel or otherwise terminate the Charter are both individual and cumulative. Charterer's exercise, or failure to exercise, any option to cancel or terminate the Charter shall not affect any other option granted to Charterer to terminate or cancel the Charter; any such cancellation or termination being without prejudice to any other rights and remedies Charterer may have under the circumstances including, without limitation, the right to damages for any breach of the Charter. Any right of Charterer to terminate the Charter shall remain in place and be valid unless and until Charterer gives specific written notice to Owner that Charterer has waived such right. Under no circumstances shall new or additional activities under the Charter (including, without limitation, loading additional cargo, calling at additional ports, transmitting or changing voyage intentions, transmitting or changing voyage orders, or any other communication regarding future voyages) (**"Additional Activities"**) be construed as a waiver by Charterer of any right to terminate the Charter. Nor shall undertaking any Additional Activities constitute, or be deemed to constitute, an election by Charterer to continue the Charter. No modification, waiver or discharge of any term of the Charter shall be valid unless in writing and signed by the party to be charged therewith. No provision of the Charter shall be interpreted or construed against a party because that party or its legal representative drafted the provision. Notwithstanding anything in the Charter to the contrary, the Charter shall not be interpreted or applied so as to require Owner or Charterer to do, or to refrain from doing, anything which would constitute a violation of, or result in a loss of economic benefit under, United States laws and regulations. When used in the Charter in relation to Charterer, the terms "associated or affiliated company" or "associated or affiliated companies" shall include ~~Exxon Mobil Corporation~~ *Novum Energy Trading Inc.* , or any division of ~~Exxon Mobil Corporation~~ *Novum Energy Trading Inc.*, or any company (other than Charterer) that is directly or indirectly owned, in whole or in part, ~~Exxon Mobil Corporation~~ *Novum Energy Trading Inc.*. The term "Clause," when used in the Charter, shall mean a clause of the Charter.

## 33 Special Provisions

    a. **Vessel capacity:**
       **B. No. 240 Segregations:**
       **System #1 – tanks 1-2 (port & starboard) --- 34,022 bbls**
       **System #2 – tanks 3-4 (port & starboard) --- 35,334 bbls**
       **System #3 – tanks 5-6 (port & starboard) --- 35,294 bbls**
       **System #4 – tanks 7-8 (port & starboard) --- 31,568 bbls**

    b. **Fuel oil / Lube Oil for Charterer's account**

    c. **Port / Pilot / Assist Tugs / Line Handlers / Agency Fees / Security Costs for Charterer's account**

    d. **The Owner will make best effort to have the tug remain in the notch of the barge during cargo operations, loading and discharging, as per local regulation, provided that it is a safe operation in the Captain's discretion, but pins will not be engaged.**

    e. **Charter Party Administration Clause:**
       **No formal written and signed charter party will be prepared unless specifically requested by either party. charter party terms and conditions are evidenced by the broker's fixture confirmation email/fax in conjunction with written approval of that email/fax by both the owner and the charterer; each party shall confirm agreement by their authorized representative within two (2) working days by email/fax to the other party through the fixing broker. if notice is not received within three (3) working days of final recap, then all will be deemed to be accepted. special clauses contained as addenda to the standard charter party referenced shall take precedence.**

    f. **Brokerage: A commission of 1.25% on hire earned under this charter party is payable by Owner to L&R Midland, Inc.**

*IN WITNESS WHEREOF, THE PARTIES HAVE CAUSED THIS CHARTER PARTY TO BE EXECUTED IN DUPLICATE THE DAY AND YEAR HEREIN FIRST ABOVE WRITTEN.*

*WITNESS* _____     *FOR  OWNER*

                            BY: _____

                            NAME: _____

                            TITLE: _____

                            DATE SIGNED: _____

*WITNESS* _____     *FOR  CHARTERER*

                            BY: _____

                            NAME: _____

                            TITLE: _____

                            DATE SIGNED: _____

## Schedule A — Warranted Description of Vessel (Barge)

| | Section 1 — General Information | |
|---|---|---|
| 1.1 | Name of the Vessel: | |
| 1.2 | LR/IMO number: | |
| 1.3 | Flag: | |
| 1.4 | Call sign | |
| 1.5 | INMARSAT number: | |
| 1.6 | Facsimile number: | |
| 1.7 | Mobile phone number: | |
| 1.8 | E-mail address: | |
| 1.9 | P & I Club: | |
| 1.10 | Type of ship: | |
| 1.11 | Type of hull: | |
| 1.12 | Meets IMO double-hull requirements: | |
| 1.13 | Vessel is inherently stable in all conditions of loading/ballast: | |
| 1.14 | Bow thruster fitted: | |
| | Section 2 — Ownership and Operation | |
| 2.1 | **Registered Owner** | |
| 2.1.1 | Name: | |
| 2.1.2 | Address: | |
| 2.1.3 | Telephone number: | |
| 2.1.4 | Facsimile number: | |
| 2.1.5 | E-mail address: | |
| 2.1.6 | Contract person: | |
| 2.1.7 | Contact person's after-hours telephone: | |
| 2.2 | **Technical Manager (Vessel "Operator" holding the ISM Code Document of Compliance)** | |
| 2.2.1 | Name: | |
| 2.2.2 | Address: | |
| 2.2.3 | Telephone number: | |
| 2.2.4 | Facsimile number: | |
| 2.2.5 | E-mail address: | |
| 2.2.6 | Contract ("Designated") person: | |
| 2.2.7 | Contact person's after-hours telephone: | |
| 2.2.8 | Emergency call-out number: | |
| 2.2.9 | Eligible for time charter period of: | |
| 2.3 | **Commercial Manager** | |
| 2.3.1 | Name: | Bouchard Transportation Co., Inc. |
| 2.3.2 | Address: | 58 South Service Road, suite 150, Melville, NY 11747 |
| 2.3.3 | Telephone number: | 631 390 4900 |
| 2.3.4 | Facsimile number: | |
| 2.3.5 | E-mail address: | |
| 2.3.6 | Contract person: | |
| 2.3.7 | Contact person's after-hours telephone: | |
| | Section 3 — Construction | |
| 3.1 | Builder: | |
| 3.2 | Date of building contract: | |

| | | | | | |
|---|---|---|---|---|---|
| 3.3 | Hull number: | | | | |
| 3.4 | Date keel laid: | | | | |
| 3.5 | Date launched: | | | | |
| 3.6 | Date delivered: | | | | |
| 3.7 | Classification society: | | | | |
| 3.8 | Class notations: | | | | |
| 3.9 | Is vessel structure limited to no more than 30% high strength steel? | | | | |
| 3.9.1 | If NO, has an advanced structural analysis been performed? | | | | |
| 3.9.2 | By whom? | | | | |
| 3.10 | If DH, are ballast/double hull spaces fitted with horizontal flats at 4-6 m. increments, or stringers or oversize longitudinals with guard rails, for safe, easy inspections? | | | | |
| | **Section 4 — Dimensions** | | | | |
| 4.1 | Length overall (LOA): | | | | |
| 4.2 | Extreme breadth: | | | | |
| 4.3 | Moulded depth: | | | | |
| 4.4 | Keel to masthead: | | | | |
| 4.5 | Distance from bow to front of bridge: | | | | |
| 4.6 | Distance from bridge front to mid-point of cargo manifold: | | | | |
| 4.7 | Distance from bow to mid-point of cargo manifold: | | | | |
| 4.8 | Distance from stern to mid-point of cargo manifold: | | | | |
| 4.9 | **Parallel Mid-body ("PMB")** | | | | |
| 4.9.1 | Length of PMB at light ship draft: | | | | |
| 4.9.2 | Length of PBM forward of mid-point of cargo manifold at light ship draft: | | | | |
| 4.9.3 | Length of PBM aft of mid-point of cargo manifold at light ship draft: | | | | |
| 4.9.4 | Length of PMB at normal ballast draft: | | | | |
| 4.9.5 | Length of PBM forward of mid-point of cargo manifold at normal ballast draft: | | | | |
| 4.9.6 | Length of PBM aft of mid-point of cargo manifold at normal ballast draft: | | | | |
| 4.9.7 | Length of PMB at summer draft: | | | | |
| 4.9.8 | Length of PBM forward of mid-point of cargo manifold at summer draft: | | | | |
| 4.4.9 | Length of PBM aft of mid-point of cargo manifold at summer draft: | | | | |
| 4.10 | **Register Tonnages** | | | | |
| 4.10.1 | Gross Tonnage: | | | | |
| 4.10.2 | Net Tonnage: | | | | |
| 4.10.3 | Suez Canal Tonnage: | | | | |
| 4.10.4 | Panama Canal Tonnage: | | | | |
| 4.11 | **Load Line Information** | Freeboard | Draft | Deadweight | Displacement |
| 4.11.1 | At summer marks | | | | |
| 4.11.2 | At winter marks | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 4.11.3 | At tropical marks | | | | |
| 4.11.4 | In lightship condition | | | | |
| 4.11.5 | At normal ballast condition | | | | |
| 4.12 | FWA at summer draft: | | | | |
| 4.13 | TPC immersion at summer draft: | | | | |
| 4.14 | Draft forward in normal ballast condition: | | | | |
| 4.15 | Draft aft in normal ballast condition: | | | | |
| 4.16 | Minimum height of mast above waterline in departure ballast condition ("air draft"): | | | | |
| 4.17 | Maximum freeboard amidships in normal departure ballast condition: | | | | |
| 4.18 | Lightship weight: | | | | |

| Section 5 — Engine Room | | |
|---|---|---|
| 5.1 | Main engine maker: | |
| 5.2 | Model of main engine: | |
| 5.3 | Rated power of main engine: | |
| 5.4 | Lowest sustainable speed for lightering: | |
| 5.5 | Barred speed ranges (if any): | |
| 5.6 | Cruising range at maximum horsepower: | |
| 5.7 | Number of ship's service generators: | |
| 5.8 | Capacity of ship's service generators: | |
| 5.9 | Number of fresh water evaporators: | |
| 5.10 | Capacity of each fresh water evaporator: | |
| 5.11 | Type of bilge water separator: | |
| 5.12 | Capacity of bilge water separator: | |
| 5.13 | Other means of bilge water disposal: | |
| 5.14 | Number of independent steering motors/pumps: | |
| 5.15 | In event of main power failure one steering motor/pump will operate: | |
| 5.16 | Does steering system comply with SOLAS II Regulation 29 paragraph 16 or 20 if Vessel built prior to Sept. 1994? | |
| 5.17 | Is engine room fitted with high-level bilge alarm? | |
| 5.18 | Number of fuel oil tanks: | |
| 5.19 | Total capacity of fuel oil tanks: | |
| 5.20 | Number of diesel oil tanks: | |
| 5.21 | Total capacity of diesel oil tanks: | |
| 5.22 | Are bunker tanks fitted with a remote gauging system? | |
| 5.23 | Are bunker tanks fitted with high-level alarms on the gauging system? | |
| 5.24 | Are bunker tanks fitted with backup independent high-level alarms? | |

| Section 6 — Cargo and Ballast Tanks | | |
|---|---|---|
| 6.1 | Number of center cargo tanks: | |
| 6.2 | Number of wing cargo tanks: | |
| 6.3 | Total cargo tank capacity (at 100%) | |
| 6.4 | Number of slop tanks: | |

**B NO. 240 and M/V BARBARA E. BOUCHARD** Time Charter dated *[ March 27, 2019]*

| 6.5 | Slop tank capacity (at 100%) | |
| 6.6 | Are cargo tanks coated? | |
| 6.7 | Maker and type of cargo tank coating: | |
| 6.8 | Are slop tanks coated? | |
| 6.9 | Maker and type of slop tank coating: | |
| 6.10 | Are cargo tanks coiled? | |
| 6.11 | Material of cargo tank coils: | |
| 6.12 | Are slop tanks coiled? | |
| 6.13 | Material of slop tank coils: | |
| 6.14 | Are cargo heat exchangers fitted? | |
| 6.15 | Material of heat exchangers: | |
| 6.16 | Can Vessel can raise cargo temperature by 4°C per day to at least 57°C and maintain cargo temperature at 57°C throughout the laden passage and discharge? | |
| 6.17 | Can cargo at a temperature of 74°C be loaded? | |
| 6.18 | Maximum permissible temperature of cargo loaded: | |
| 6.19 | Are cargo and slop tanks are fitted with a remote gauging system? | |
| 6.20 | Type of gauging system fitted in cargo and slop tanks: | |
| 6.21 | Are cargo and slop tanks are fitted with high-level alarms on the gauging system? | |
| 6.22 | Are cargo and slop tanks also fitted with back-up independent high-level alarms? | |
| 6.23 | Number and capacity of natural cargo tank groups: | |
| 6.24 | Are ballast tanks coated? | |
| 6.25 | Type of ballast tank coating: | |
| 6.26 | Are aluminum anodes used in cargo or ballast tanks? | |
| 6.27 | If yes, are they shielded? | |
| 6.28 | Maximum distance above tank bottom: | |
| 6.29 | Do anodes contain >0.02% Mg or 0.10% Si? | |
| 6.30 | Are the cargo tanks, including heating coils, free of copper, zinc, cadmium and their alloys? | |
| 6.31 | Is a cargo tank coating condition record maintained onboard? | |
| 6.32 | Is a ballast tank coating condition record maintained onboard? | |
| 6.33 | How many incompatible grades can be carried with double valve segregation? | |
| **Section 7 — Pipelines, Pumps and Vent System** | | |
| 7.1 | Is segregated ballast handled by separate pump and line? | |
| 7.2 | Are overboard stripping and/or cargo lines fitted with spectacle blanks? | |

| 7.3 | If not fitted with blanks, are they provided with double valves with an integrity testing arrangement? | |
| 7.4 | Type of tank vent system: | Common line, individual PV, vapor collection |
| 7.5 | Capacity of tank vent system: | |
| 7.6 | Do tank vent locations and velocities comply with Chapter 16 of the International Safety Guide for Oil Tankers and Terminals (ISGOTT)? | |
| 7.7 | Do tanks have individual high capacity pressure/vacuum breaking devices (with no valve or blind to tank) for cargo loading/discharge? | Yes |
| 7.8 | Is there a positive means of preventing tank over/under pressure (e.g., an interlock between isolating valve and tank hatch)? | |
| 7.9 | Maximum loading rate accepted: | |
| 7.10 | Number and type of cargo pumps: | |
| 7.11 | Capacity of each cargo pump: | |
| 7.12 | Pressure at manifold at rated pump capacity: | 100 psi |
| 7.13 | If equipped with deepwell pumps, can vessel load without going through the pumps (i.e., independent drop lines)? | |
| 7.14 | Are cargo pumps fitted with over-speed trips? | |
| 7.15 | Are cargo pumps fitted with high temperature alarms? | |
| 7.16 | Are cargo pumps fitted with high temperature trips? | |
| 7.17 | Type of cargo stripping equipment: | |
| 7.18 | Capacity of cargo stripping equipment: | |
| 7.19 | Are main cargo lines equipped with stripping suctions? | |
| 7.20 | Are cargo valves at the pump room bulkhead of the gate type? | |
| 7.21 | Material of the cargo valves at the pump room bulkhead: | |
| 7.22 | Are separate stripping lines fitted? | |
| 7.23 | Can ballast and cargo be handled simultaneously with double valve segregation at all times within the pump room and in the cargo tank area? | |
| 7.24 | Can the vessel de-ballast in 12 hours? | |
| 7.25 | Can the vessel de-ballast in 12 hours if ballast must be pumped ashore? | |
| 7.26 | Number and type of ballast pumps: | |
| 7.27 | Capacity of each ballast pump: | |
| 7.28 | Is vessel equipped with Loadmaster or other equipment to ascertain hull stress during cargo handling? | No. ABS approved loading manual |

**B NO. 240 and M/V BARBARA E. BOUCHARD** Time Charter dated *[ March 27, 2019]*

| 7.29 | If double hull, does computer also calculate intact stability? | |
| 7.30 | Is a warning alarm fitted to the loading computer? | |
| 7.31 | Is vessel equipped with a fixed system to continuously monitor for flammable atmospheres? | |
| 7.31.1 | In the cargo pump room, if fitted? | |
| 7.31.2 | Sensor/sampling points at bottom of pump room? | |
| 7.31.3 | At top of pump room? | |
| 7.31.4 | In cofferdams? | |
| 7.31.5 | Other spaces? (list) | |
| 7.32 | Is there an emergency cargo pump shut-down in cargo control room? | |
| 7.32.1 | In upper pump room? | |
| 7.32.2 | At manifold? | |
| 7.33 | Do cargo seachests have double valves? | |
| 7.33.1 | Type of Valve(s): | |
| 7.33.2 | Material of valves: | |
| 7.34 | Do cargo seachest valves have tightness testing arrangement? | |
| 7.35 | Is pump room fitted with a high-level bilge alarm? | |
| 7.36 | Date of last pressure test of cargo piping and valves: | |
| | **Section 8 — Cargo Manifolds** | |
| 8.1 | Number and size of flanges: | |
| 8.2 | Material and standard: | |
| 8.3 | Flange distance from rail: | |
| 8.4 | Distance between flanges: | |
| 8.5 | Flange height above deck: | |
| 8.6 | Flange height above drip tray: | |
| 8.7 | Type of manifold valves: | |
| 8.8 | Material of manifold valves: | |
| 8.9 | Number of reducers available: | |
| 8.10 | Sizes of reducers available: | |
| 8.11 | Standard of flanges: | |
| 8.12 | Are manifold pressure gauges fitted outboard of the manifold valves? | |
| 8.13 | Are cargo manifolds, bunker connections, and lifting equipment in complete conformity with OCIMF standards including a vapor recovery (fore and aft of manifold) system? | |
| 8.13.1 | List exceptions, if any: | |
| 8.14 | Capacity of hose handling boom (SWL): | |
| 8.14.1 | Location: P / S | |
| 8.14.2 | Boom length: | |
| 8.14.3 | Reach outboard from deck edge: | |

| 8.15 | Are cross connections at manifold between tank groups protected by blinds? | |
|---|---|---|
| 8.15.1 | Double valves? | |
| 8.15.2 | A combination of valve and blind? | |

| **Section 9 — Inert Gas and Tank Washing Systems** | | |
|---|---|---|
| 9.1 | Manufacturer of I.G. system: | |
| 9.2 | Deck seal type (wet, semi-dry, dry): | |
| 9.3 | Is manual for operation of IGS on board? | |
| 9.4 | Number of portable $O_2$ meters available on board: | |
| 9.5 | Does fixed $O_2$ meter have a recorder? | |
| 9.6 | Number MSA Tankscopes (or equivalent) available on board: | |
| 9.7 | Is vessel equipped for full tank washing? | |
| 9.8 | Type and total number of fixed machines: | |
| 9.9 | Can fixed tank washing machines be programmed? | |
| 9.10 | Full cycle time for fixed tank washing machines: | |
| 9.11 | How many tank washing machines can be operated simultaneously? | |
| 9.12 | Is manual for tank washing operations on board? | |
| 9.13 | Do vessel personnel have tank washing experience? | |
| 9.14 | If double-hull, can ballast spaces be inerted in an emergency? | |
| 9.15 | Is a fixed ballast tank inerting system installed? | |
| 9.16 | Can ballast spaces be purged with air? | |
| 9.17 | Is a fixed ballast tank purging system installed? | |
| 9.18 | Is there a topping-off inert gas generator? | |

| **Section 10 — Mooring Equipment** | | |
|---|---|---|
| 10.1 | Number of self-stowing mooring winches on forecastle: | |
| 10.2 | Number of self-stowing mooring winches forward of manifold on main deck: | |
| 10.3 | Number of self-stowing mooring winches forward of manifold on main deck port side: | |
| 10.4 | Number of self-stowing mooring winches aft of manifold on main deck: | |
| 10.5 | Number of self-stowing mooring winches aft of manifold on main deck port side: | |
| 10.6 | Number of self-stowing mooring winches on poop deck: | |
| 10.7 | Are the winches split drum type? | |
| 10.8 | Winch brake holding capacity: | |
| 10.9 | Mooring winches heaving capacity: | |

**B NO. 240 and M/V BARBARA E. BOUCHARD** Time Charter dated [ *March 27, 2019* ]

| 10.10 | If brake holding capacity exceeds 60% of mooring line breaking strength, can it be adjusted to 60%? | |
|---|---|---|
| 10.11 | Winch brake application method (spring with hydraulic release / hand wheel / other? | |
| 10.12 | Is a winch brake testing kit available? | |
| 10.13 | Are torque wrenches available to set winch brakes? | |
| 10.14 | Number of mooring wires fitted on winch drums: | |
| 10.15 | Mooring wire length: | |
| 10.16 | Mooring wire diameter: | |
| 10.17 | Mooring wire breaking strength: | |
| 10.18 | Number of synthetic lines fitted on winch drums: | |
| 10.19 | Number of synthetic lines available on station: | |
| 10.20 | Synthetic line length: | |
| 10.21 | Synthetic line circumference: | |
| 10.22 | Synthetic line breaking strength: | |
| 10.23 | Does vessel fully comply with OCIMF "Recommendations for Equipment Employed in the Mooring of Ships at Single Point Moorings"? | |
| 10.23.1 | List exceptions, if any: | |
| 10.24 | Type of SPM mooring fitting installed: | |
| 10.24.1 | Number of SPM fittings: | |
| 10.24.2 | Holding capacity of SPM fittings: | |
| 10.25 | Bow chock dimensions: | |
| 10.26 | Are mooring chocks of the closed type? | |
| 10.26.1 | Universal (roller) type? | |
| 10.26.2 | Panama type? | |
| 10.27 | How many bitts forward of the manifold on the port side? | |
| 10.28 | If used, do synthetic mooring tails meet OCIMF Guidelines? | |
| 10.28.1 | Length of synthetic tails? | |
| 10.28.2 | Number of anti-chafing wire tails 11m in length with 1.8m eyes at the working end: | |
| 10.28.3 | Vessel has sufficient Mandal or Tonsberg shackles to connect synthetic tails to the mooring wires and wire anti-chafing tails to the synthetic tails: | |
| 10.29 | Distance from mid-point of cargo manifold to first spring line forward: | |
| 10.30 | Distance from mid-point of cargo manifold to first spring line aft: | |
| 10.31 | Does vessel have equipment to rig fire wires? | |
| 10.32 | Does vessel have emergency towing per SOLAS Reg. 15-1? | |

Initials for Owner: _____          Initials for Charterer: _____

**B NO. 240 and M/V BARBARA E. BOUCHARD** Time Charter dated *[ March 27, 2019]*

| 10.32.1 | If NO, when will it be installed? | |
| 10.33 | Is a towing bracket provided aft on upper deck? | |
| 10.34 | Are fender davits available on the portside fore and aft? | |
| 10.34.1 | Safe working load of davits: | |
| 10.35 | Anchor holding capacity: | |
| 10.36 | Anchor chain size: | |
| 10.37 | Anchor chain length: | |
| 10.38 | Number of messenger lines: | |
| 10.38.1 | Length of messenger lines: | |
| 10.38.2 | Diameter of messenger lines: | |
| 10.38.3 | Material of messenger lines: | |
| **Section 11 — Navigation Equipment** | | |
| 11.1 | Number of Radars: | N/A |
| 11.2 | Number of gyro compasses: | |
| 11.3 | Is gyro error record book kept? | |
| 11.4 | Is a course recorder fitted? | |
| 11.5 | Is an ARPA installed? | |
| 11.6 | Are manual radar plotting facilities available? | |
| 11.7 | Is vessel equipped with a magnetic compass? | |
| 11.8 | Is the deviation card current and posted? | |
| 11.9 | Is a magnetic compass off-course alarm fitted? | |
| 11.10 | Is vessel equipped with GPS? | |
| 11.11 | Is GPS with speed indication and Cross Track Error (XTE) fitted? | |
| 11.12 | Is a Navtex receiver fitted? | |
| 11.13 | Is a satellite communication system installed? | |
| 11.14 | Number of UHF walkie-talkies: | |
| 11.15 | Is speed log installed? | |
| 11.16 | Two-axis Doppler speed log installed? | |
| 11.17 | Is a rate-of-turn indicator fitted? | |
| 11.17.1 | Are there bridge wing repeaters for the rate-of-turn indicator? | |
| 11.18 | Is a depth finder fitted? | |
| 11.18.1 | Does the depth finder have a recorder? | |
| 11.19 | Are RPM and Rudder Angle indicators fitted? | |
| 11.19.1 | Are RPM and Rudder Angle indicators fitted at the bridge wings? | |
| 11.20 | Is a "Bell" logger installed? | |
| 11.21 | Are there steering and engine controls on bridge wings? | |
| 11.22 | Is the vessel fitted with the following miscellaneous equipment: | |
| 11.22.1 | Computer with modem? | |

| 11.22.2 | Wind speed and direction indicator? | |
|---------|-------------------------------------|---|
| 11.22.3 | Fax? | |
| 11.22.4 | Weather fax? | |
| 11.22.5 | Three cellular telephones? | |
| 11.23 | Is there an established system to ensure the vessel is provided with all necessary nautical publications and charts of suitable scales for the trades intended? | |
| 11.23.1 | Are records maintained to verify regular updating and correction of all nautical publications and navigation charts? | |
| 11.23.2 | Does the vessel receive regular Notices to Mariners appropriate to the trading areas? | |
| 11.23.3 | Is the Vessel fitted with a Bridge Event Recorder? | |
| **Section 12 — Oil Pollution Prevention** | | |
| 12.1 | Height of main deck fish plate (gutter bar) amidships: | |
| 12.1.1 | Aft: | |
| 12.1.2 | Transverse: | |
| 12.2 | Is there a deck dump-valve into the slop tanks? | |
| 12.2.1 | If yes, is a loop seal provided to contain pressure? | |
| 12.3 | Scupper plugs, type/material: | |
| 12.3.1 | If wood, are they cemented? | |
| 12.4 | Does vessel operate under an environmental policy covering wastes, garbage, sewage, noxious liquids/vapors and environmentally damaging substances? | |
| 12.5 | Is there adequate storage for readily available pollution control equipment: | |
| 12.6 | Do deck machinery, bunker manifolds and tank vents have fixed spill containment? | |
| 12.7 | Method of removing oil from enclosed area/containment: | |
| **Section 13 — Manuals/Logs/Training/Procedures** | | |
| 13.1 | Are the following manuals/logs available on board: | |
| 13.1.1 | Bridge Procedure Manual? | |
| 13.1.2 | Deck Log? | |
| 13.1.3 | Oil Record Books (Deck and Engine)? | |
| 13.1.4 | Fire Fighting Manual? | |
| 13.1.5 | Record of Cargo Piping Tests? | |
| 13.1.6 | Material Safety Data Sheets? | |
| 13.1.7 | International Safety Guide for Oil Tankers and Terminals (ISGOTT), latest edition? | |
| 13.1.8 | ICS/OCIMF: Ship to Ship Transfer Guide (Petroleum), latest edition? | |

Initials for Owner: _____    Initials for Charterer: _____

**B NO. 240 and M/V BARBARA E. BOUCHARD** Time Charter dated [ *March 27, 2019* ]

| | | |
|---|---|---|
| 13.1.9 | Manual with maximum loading rates, tank venting capacity, maximum tank pressure and vacuum for each tank? | |
| 13.1.10 | IMO: Safety of Life at Sea (SOLAS) latest consolidated edition | |
| 13.1.11 | IMO: Inert Gas Systems, latest edition? | |
| 13.1.12 | ICS: Guide to Helicopter/Ship Operations, latest edition | |
| 13.1.13 | ICS: Bridge Procedures Guide, latest edition | |
| 13.1.14 | IMO: Recommendations on Basic Principles and Operating Guidance Relating to Navigational Watchkeeping | |
| 13.1.15 | IMO: International Convention on Standards of Training, Certification, and Watchkeeping (STCW 1995), latest edition? | |
| 13.1.16 | IMO: International Regulations for Preventing Collisions at Sea, 1972, latest edition? | |
| 13.1.17 | IMO: Ships Routing, latest edition | |
| 13.1.18 | U.K. Dept. of Trade Merchant Shipping Notice No. M.854? | |
| 13.1.19 | IMO: MARPOL 73/78 Consolidated Edition (1991) including 1992 Amendments to Annex I and 1994-95 Amendments? | |
| 13.1.20 | Ship-specific Oil Transfer procedures (per U.S. Coast Guard requirements)? | |
| 13.1.21 | ICS/OCIMF: Prevention of Oil Spillages through Cargo Pump Room Sea Valves, latest edition? | |
| 13.1.22 | IMO: Crude Oil Washing Systems, latest edition | |
| 13.1.23 | ICS/OCIMF: Clean Seas Guide for Oil Tankers - Retention of Oil Residues On Board, latest edition? | |
| 13.1.24 | OCIMF: Mooring Equipment Guidelines, latest edition? | |
| 13.1.25 | OCIMF: Recommendations for Equipment Employed in the Mooring of Ships at Single Point Moorings, latest edition | |
| 13.1.26 | OCIMF: Effective Mooring, latest edition? | |
| 13.1.27 | OCIMF: Guidelines for the Control of Drugs and Alcohol On Board Ships, latest edition? | |
| 13.2 | Do all Deck Officers attend radar refresher training? | |
| 13.2.1 | How often? | |
| 13.3 | List any special training possessed by officers (e.g., ship handling simulator courses, on board training, etc.) | |

Initials for Owner: _____          Initials for Charterer: _____

**B NO. 240 and M/V BARBARA E. BOUCHARD** Time Charter dated *[ March 27, 2019]*

| 13.4 | Other procedures established and available on board: | |
|------|------|---|
| 13.4.1 | Emergency response? | |
| 13.4.2 | Collision? | |
| 13.4.3 | Grounding? | |
| 13.4.4 | Oil spill? | |
| 13.4.5 | Fire? | |
| 13.4.6 | Tank Entry Permit Procedure? | |
| 13.4.7 | Is it required that the cargo tank and slop tank atmospheres be tested prior to loading or opening cargo tanks? | |
| 13.4.7.1 | Are results of these tests entered in a log? | |
| 13.4.8 | Mooring? | |
| 13.4.9 | Cargo handling? | |
| 13.4.10 | Maintenance and testing of equipment and systems? | |
| **Section 14 — Regulatory Requirements** | | |
| 14.1 | Does vessel fully comply with all applicable international conventions, laws, regulations and/or other requirements of the country of the vessel's registry and of the countries and/or ports and/or places to which the vessel may be ordered while in Charterer's service? | |
| 14.2 | Date of full compliance with the ISM Code for Operator: | |
| 14.3 | Date of full compliance with the ISM Code for Vessel: | |
| **Section 15 — Manning/Licensing** | | |
| 15.1 | Nationality and licenses of officers: | |
| 15.2 | Total Number of Deck Officers (Including Master): | |
| 15.3 | Total Number of Engineer Officers (Including Chief Engineer): | |
| 15.4 | Are Master and any Officer-in-Charge of cargo/bunker operations proficient in conversational English? | |
| 15.5 | Does the vessel operate under a Drug and Alcohol Policy that complies with ExxonMobil requirements? | |
| 15.6 | Do leave/rotation procedures include provisions for monitoring regular and relief crew competence and experience as well as controlling maximum hours worked and fatigue reduction steps? | |
| 15.7 | Do all officers possess valid certificates/licenses appropriate to their rank and/or position on the vessel and the intended trade, including Dangerous Cargo Endorsements per STCW? | |

Initials for Owner: _____        Initials for Charterer: _____

**B NO. 240 and M/V BARBARA E. BOUCHARD** Time Charter dated *[ March 27, 2019]*

| | Section 16 — Cargo Measurement and Sampling | |
|---|---|---|
| 16.1 | Are vapor locks fitted? | |
| 16.2 | Are vapor locks calibrated for ullage measurement? | |
| 16.3 | Are vapor locks calibrated for innage measurement? | |
| 16.4 | Are vapor locks calibrated for wedge tables? | |
| 16.5 | Have the vapor lock calibrations been certified by a Classification Society or other recognized organization? | |
| 16.5.1 | If Yes, name of certifying body: | |
| 16.6 | Are sonic ullage tapes available? | |
| 16.6.1 | How many sonic ullage tapes are on board? | |
| 16.6.2 | Can sonic tapes measure ullage? | |
| 16.6.3 | Can sonic tapes measure temperature? | |
| 16.6.3 | Can sonic tapes measure oil/water interface layer? | |
| 16.7 | Are sampling devices available for use through vapor locks? | |
| 16.8 | Number of vapor lock sampling containers: | |
| 16.8.1 | Size of sample containers: | |
| 16.9 | Number of certified reference standard thermometers: | |
| 16.10 | Number of Explosimeters: | |
| 16.11 | Number of toxic gas detectors: | |
| 16.11.1 | Are they certified to detect $H_2S$ accurately in both air and inert gas environment? | |
| 16.12 | Do sounding pipes extend full depth of tanks? | |
| 16.13 | Are precautions against electrostatic ignitions (per ISGOTT) followed? | |
| | Section 17 — Navigation | |
| 17.1 | Owner warrants that it will maintain a navigation and bridge procedures policy/manual conforming to ICS/IMO STCW standards: | |
| | Section 18 — Classification Society Surveys | |
| 18.1 | Date of last dry-dock/repairs and shipyard name | |
| 18.2 | Was last special survey conducted under an Enhanced Survey Program? | |
| 18.3 | Date of last special survey: | |
| 18.4 | Are the following on board: | |
| 18.4.1 | Survey Planning Document? | |
| 18.4.2 | Hull Structural Survey Report? | |
| 18.4.3 | Executive Hull Summary? | |
| 18.5 | Date of next special survey: | |

## Schedule A — Warranted Description of Vessel (Tug)

| | Section 1 — General Information | |
|---|---|---|
| 1.1 | Name of the Vessel: | |
| 1.2 | LR/IMO number: | |
| 1.3 | Flag: | |
| 1.4 | Call sign | |
| 1.5 | INMARSAT number: | |
| 1.6 | Facsimile number: | |
| 1.7 | Mobile phone number: | |
| 1.8 | E-mail address: | |
| 1.9 | P & I Club: | |
| 1.10 | Type of ship: | |
| 1.11 | Type of hull: | |
| 1.12 | Meets IMO double-hull requirements: | |
| 1.13 | Vessel is inherently stable in all conditions of loading/ballast: | |
| 1.14 | Bow thruster fitted: | |
| | Section 2 — Ownership and Operation | |
| 2.1 | **Registered Owner** | |
| 2.1.1 | Name: | |
| 2.1.2 | Address: | |
| 2.1.3 | Telephone number: | |
| 2.1.4 | Facsimile number: | |
| 2.1.5 | E-mail address: | |
| 2.1.6 | Contract person: | |
| 2.1.7 | Contact person's after-hours telephone: | |
| 2.2 | **Technical Manager (Vessel "Operator" holding the ISM Code Document of Compliance)** | |
| 2.2.1 | Name: | |
| 2.2.2 | Address: | |
| 2.2.3 | Telephone number: | |
| 2.2.4 | Facsimile number: | |
| 2.2.5 | E-mail address: | |
| 2.2.6 | Contract ("Designated") person: | |
| 2.2.7 | Contact person's after-hours telephone: | |
| 2.2.8 | Emergency call-out number: | |
| 2.2.9 | Eligible for time charter period of: | |
| 2.3 | **Commercial Manager** | |
| 2.3.1 | Name: | |
| 2.3.2 | Address: | |
| 2.3.3 | Telephone number: | |
| 2.3.4 | Facsimile number: | |
| 2.3.5 | E-mail address: | |
| 2.3.6 | Contract person: | |
| 2.3.7 | Contact person's after-hours telephone: | |

| | **Section 3 — Construction** | |
|---|---|---|
| 3.1 | Builder: | |
| 3.2 | Date of building contract: | |
| 3.3 | Hull number: | |
| 3.4 | Date keel laid: | |
| 3.5 | Date launched: | |
| 3.6 | Date delivered: | |
| 3.7 | Classification society: | |
| 3.8 | Class notations: | |
| 3.9 | Is vessel structure limited to no more than 30% high strength steel? | |
| 3.9.1 | If NO, has an advanced structural analysis been performed? | |
| 3.9.2 | By whom? | |
| 3.10 | If DH, are ballast/double hull spaces fitted with horizontal flats at 4-6 m. increments, or stringers or oversize longitudinals with guard rails, for safe, easy inspections? | |
| | **Section 4 — Dimensions** | |
| 4.1 | Length overall (LOA): | |
| 4.2 | Extreme breadth: | |
| 4.3 | Moulded depth: | |
| 4.4 | Keel to masthead: | |
| 4.5 | Distance from bow to front of bridge: | |
| 4.6 | Distance from bridge front to mid-point of cargo manifold: | |
| 4.7 | Distance from bow to mid-point of cargo manifold: | |
| 4.8 | Distance from stern to mid-point of cargo manifold: | |
| 4.9 | **Parallel Mid-body ("PMB")** | |
| 4.9.1 | Length of PMB at light ship draft: | |
| 4.9.2 | Length of PBM forward of mid-point of cargo at light ship draft: | |
| 4.9.3 | Length of PBM aft of mid-point of cargo manifold at light ship draft: | |
| 4.9.4 | Length of PMB at normal ballast draft: | |
| 4.9.5 | Length of PBM forward of mid-point of cargo manifold at normal ballast draft: | |
| 4.9.6 | Length of PBM aft of mid-point of cargo manifold at normal ballast draft: | |
| 4.9.7 | Length of PMB at summer draft: | |
| 4.9.8 | Length of PBM forward of mid-point of cargo manifold at summer draft: | |
| 4.4.9 | Length of PBM aft of mid-point of cargo manifold at summer draft: | |
| 4.10 | **Register Tonnages** | |
| 4.10.1 | Gross Tonnage: | |
| 4.10.2 | Net Tonnage: | |
| 4.10.3 | Suez Canal Tonnage: | |
| 4.10.4 | Panama Canal Tonnage: | |

*B NO. 240 and M/V BARBARA E. BOUCHARD* Time Charter dated *[ March 27, 2019]*

| 4.11 | Load Line Information | Freeboard | Draft | Deadweight | Displacement |
|---|---|---|---|---|---|
| 4.11.1 | At summer marks | | | | |
| 4.11.2 | At winter marks | | | | |
| 4.11.3 | At tropical marks | | | | |
| 4.11.4 | In lightship condition | | | | |
| 4.11.5 | At normal ballast condition | | | | |
| 4.12 | FWA at summer draft: | | | | |
| 4.13 | TPC immersion at summer draft: | | | | |
| 4.14 | Draft forward in normal ballast condition: | | | | |
| 4.15 | Draft aft in normal ballast condition: | | | | |
| 4.16 | Minimum height of mast above waterline in departure ballast condition ("air draft"): | | | | |
| 4.17 | Maximum freeboard amidships in normal departure ballast condition: | | | | |
| 4.18 | Lightship weight: | | | | |
| | **Section 5 — Engine Room** | | | | |
| 5.1 | Main engine maker: | EMD | | | |
| 5.2 | Model of main engine: | | | | |
| 5.3 | Rated power of main engine: | | | | |
| 5.4 | Lowest sustainable speed for lightering: | | | | |
| 5.5 | Barred speed ranges (if any): | | | | |
| 5.6 | Cruising range at maximum horsepower: | | | | |
| 5.7 | Number of ship's service generators: | | | | |
| 5.8 | Capacity of ship's service generators: | | | | |
| 5.9 | Number of fresh water evaporators: | | | | |
| 5.10 | Capacity of each fresh water evaporator: | | | | |
| 5.11 | Type of bilge water separator: | | | | |
| 5.12 | Capacity of bilge water separator: | | | | |
| 5.13 | Other means of bilge water disposal: | | | | |
| 5.14 | Number of independent steering motors/pumps: | | | | |
| 5.15 | In event of main power failure one steering motor/pump will operate: | | | | |
| 5.16 | Does steering system comply with SOLAS II Regulation 29 paragraph 16 or 20 if Vessel built prior to Sept. 1994? | | | | |
| 5.17 | Is engine room fitted with high-level bilge alarm? | | | | |
| 5.18 | Number of fuel oil tanks: | | | | |
| 5.19 | Total capacity of fuel oil tanks: | | | | |
| 5.20 | Number of diesel oil tanks: | | | | |
| 5.21 | Total capacity of diesel oil tanks: | | | | |
| 5.22 | Are bunker tanks fitted with a remote gauging system? | | | | |
| 5.23 | Are bunker tanks fitted with high-level alarms on the gauging system? | | | | |
| 5.24 | Are bunker tanks fitted with backup independent high-level alarms? | | | | |
| | **Section 6 — Cargo and Ballast Tanks** | | | | |
| 6.1 | Number of center cargo tanks: | | | | |

Initials for Owner: _____          Initials for Charterer: _____

*B NO. 240 and M/V BARBARA E. BOUCHARD* Time Charter dated *[ March 27, 2019]*

| 6.2 | Number of wing cargo tanks: | |
|------|------|------|
| 6.3 | Total cargo tank capacity (at 100%) | |
| 6.4 | Number of slop tanks: | |
| 6.5 | Slop tank capacity (at 100%) | |
| 6.6 | Are cargo tanks coated? | |
| 6.7 | Maker and type of cargo tank coating: | |
| 6.8 | Are slop tanks coated? | |
| 6.9 | Maker and type of slop tank coating: | |
| 6.10 | Are cargo tanks coiled? | |
| 6.11 | Material of cargo tank coils: | |
| 6.12 | Are slop tanks coiled? | |
| 6.13 | Material of slop tank coils: | |
| 6.14 | Are cargo heat exchangers fitted? | |
| 6.15 | Material of heat exchangers: | |
| 6.16 | Can Vessel can raise cargo temperature by 4°C per day to at least 57°C and maintain cargo temperature at 57°C throughout the laden passage and discharge? | |
| 6.17 | Can cargo at a temperature of 74°C be loaded? | |
| 6.18 | Maximum permissible temperature of cargo loaded: | |
| 6.19 | Are cargo and slop tanks are fitted with a remote gauging system? | |
| 6.20 | Type of gauging system fitted in cargo and slop tanks: | |
| 6.21 | Are cargo and slop tanks are fitted with high-level alarms on the gauging system? | |
| 6.22 | Are cargo and slop tanks also fitted with back-up independent high-level alarms? | |
| 6.23 | Number and capacity of natural cargo tank groups: | |
| 6.24 | Are ballast tanks coated? | |
| 6.25 | Type of ballast tank coating: | |
| 6.26 | Are aluminum anodes used in cargo or ballast tanks? | |
| 6.27 | If yes, are they shielded? | |
| 6.28 | Maximum distance above tank bottom: | |
| 6.29 | Do anodes contain >0.02% Mg or 0.10% Si? | |
| 6.30 | Are the cargo tanks, including heating coils, free of copper, zinc, cadmium and their alloys? | |
| 6.31 | Is a cargo tank coating condition record maintained onboard? | |
| 6.32 | Is a ballast tank coating condition record maintained onboard? | |
| 6.33 | How many incompatible grades can be carried with double valve segregation? | |

| Section 7 — Pipelines, Pumps and Vent System | | |
|---|---|---|
| 7.1 | Is segregated ballast handled by separate pump and line? | |
| 7.2 | Are overboard stripping and/or cargo lines fitted with spectacle blanks? | |
| 7.3 | If not fitted with blanks, are they provided with double valves with an integrity testing arrangement? | |
| 7.4 | Type of tank vent system: | |
| 7.5 | Capacity of tank vent system: | |
| 7.6 | Do tank vent locations and velocities comply with Chapter 16 of the International Safety Guide for Oil Tankers and Terminals (ISGOTT)? | |
| 7.7 | Do tanks have individual high capacity pressure/vacuum breaking devices (with no valve or blind to tank) for cargo loading/discharge? | |
| 7.8 | Is there a positive means of preventing tank over/under pressure (e.g., an interlock between isolating valve and tank hatch)? | |
| 7.9 | Maximum loading rate accepted: | |
| 7.10 | Number and type of cargo pumps: | |
| 7.11 | Capacity of each cargo pump: | |
| 7.12 | Pressure at manifold at rated pump capacity: | |
| 7.13 | If equipped with deepwell pumps, can vessel load without going through the pumps (i.e., independent drop lines)? | |
| 7.14 | Are cargo pumps fitted with over-speed trips? | |
| 7.15 | Are cargo pumps fitted with high temperature alarms? | |
| 7.16 | Are cargo pumps fitted with high temperature trips? | |
| 7.17 | Type of cargo stripping equipment: | |
| 7.18 | Capacity of cargo stripping equipment: | |
| 7.19 | Are main cargo lines equipped with stripping suctions? | |
| 7.20 | Are cargo valves at the pump room bulkhead of the gate type? | |
| 7.21 | Material of the cargo valves at the pump room bulkhead: | |
| 7.22 | Are separate stripping lines fitted? | |
| 7.23 | Can ballast and cargo be handled simultaneously with double valve segregation at all times within the pump room and in the cargo tank area? | |
| 7.24 | Can the vessel de-ballast in 12 hours? | |
| 7.25 | Can the vessel de-ballast in 12 hours if ballast must be pumped ashore? | |

**B NO. 240 and M/V BARBARA E. BOUCHARD** Time Charter dated *[ March 27, 2019]*

| 7.26 | Number and type of ballast pumps: | |
|------|-----------------------------------|---|
| 7.27 | Capacity of each ballast pump: | |
| 7.28 | Is vessel equipped with Loadmaster or other equipment to ascertain hull stress during cargo handling? | |
| 7.29 | If double hull, does computer also calculate intact stability? | |
| 7.30 | Is a warning alarm fitted to the loading computer? | |
| 7.31 | Is vessel equipped with a fixed system to continuously monitor for flammable atmospheres? | |
| 7.31.1 | In the cargo pump room, if fitted? | |
| 7.31.2 | Sensor/sampling points at bottom of pump room? | |
| 7.31.3 | At top of pump room? | |
| 7.31.4 | In cofferdams? | |
| 7.31.5 | Other spaces? (list) | |
| 7.32 | Is there an emergency cargo pump shut-down in cargo control room? | |
| 7.32.1 | In upper pump room? | |
| 7.32.2 | At manifold? | |
| 7.33 | Do cargo seachests have double valves? | |
| 7.33.1 | Type of Valve(s): | |
| 7.33.2 | Material of valves: | |
| 7.34 | Do cargo seachest valves have tightness testing arrangement? | |
| 7.35 | Is pump room fitted with a high-level bilge alarm? | |
| 7.36 | Date of last pressure test of cargo piping and valves: | |
| **Section 8 — Cargo Manifolds** | | |
| 8.1 | Number and size of flanges: | |
| 8.2 | Material and standard: | |
| 8.3 | Flange distance from rail: | |
| 8.4 | Distance between flanges: | |
| 8.5 | Flange height above deck: | |
| 8.6 | Flange height above drip tray: | |
| 8.7 | Type of manifold valves: | |
| 8.8 | Material of manifold valves: | |
| 8.9 | Number of reducers available: | |
| 8.10 | Sizes of reducers available: | |
| 8.11 | Standard of flanges: | |
| 8.12 | Are manifold pressure gauges fitted outboard of the manifold valves? | |
| 8.13 | Are cargo manifolds, bunker connections, and lifting equipment in complete conformity with OCIMF standards including a vapor recovery (fore and aft of manifold) system? | |
| 8.13.1 | List exceptions, if any: | |

| 8.14 | Capacity of hose handling boom (SWL): | |
|---|---|---|
| 8.14.1 | Location: P / S | |
| 8.14.2 | Boom length: | |
| 8.14.3 | Reach outboard from deck edge: | |
| 8.15 | Are cross connections at manifold between tank groups protected by blinds? | |
| 8.15.1 | Double valves? | |
| 8.15.2 | A combination of valve and blind? | |
| **Section 9 — Inert Gas and Tank Washing Systems** | | |
| 9.1 | Manufacturer of I.G. system: | |
| 9.2 | Deck seal type (wet, semi-dry, dry): | |
| 9.3 | Is manual for operation of IGS on board? | |
| 9.4 | Number of portable $O_2$ meters available on board: | |
| 9.5 | Does fixed $O_2$ meter have a recorder? | |
| 9.6 | Number MSA Tankscopes (or equivalent) available on board: | |
| 9.7 | Is vessel equipped for full tank washing? | |
| 9.8 | Type and total number of fixed machines: | |
| 9.9 | Can fixed tank washing machines be programmed? | |
| 9.10 | Full cycle time for fixed tank washing machines: | |
| 9.11 | How many tank washing machines can be operated simultaneously? | |
| 9.12 | Is manual for tank washing operations on board? | |
| 9.13 | Do vessel personnel have tank washing experience? | |
| 9.14 | If double-hull, can ballast spaces be inerted in an emergency? | |
| 9.15 | Is a fixed ballast tank inerting system installed? | |
| 9.16 | Can ballast spaces be purged with air? | |
| 9.17 | Is a fixed ballast tank purging system installed? | |
| 9.18 | Is there a topping-off inert gas generator? | |
| **Section 10 — Mooring Equipment** | | |
| 10.1 | Number of self-stowing mooring winches on forecastle: | |
| 10.2 | Number of self-stowing mooring winches forward of manifold on main deck: | |
| 10.3 | Number of self-stowing mooring winches forward of manifold on main deck port side: | |
| 10.4 | Number of self-stowing mooring winches aft of manifold on main deck: | |
| 10.5 | Number of self-stowing mooring winches aft of manifold on main deck port side: | |
| 10.6 | Number of self-stowing mooring winches on poop deck: | |

**B NO. 240 and M/V BARBARA E. BOUCHARD** Time Charter dated [ *March 27, 2019*]

| 10.7 | Are the winches split drum type? | |
|------|----------------------------------|---|
| 10.8 | Winch brake holding capacity: | |
| 10.9 | Mooring winches heaving capacity: | |
| 10.10 | If brake holding capacity exceeds 60% of mooring line breaking strength, can it be adjusted to 60%? | |
| 10.11 | Winch brake application method (spring with hydraulic release / hand wheel / other? | |
| 10.12 | Is a winch brake testing kit available? | |
| 10.13 | Are torque wrenches available to set winch brakes? | |
| 10.14 | Number of mooring wires fitted on winch drums: | |
| 10.15 | Mooring wire length: | |
| 10.16 | Mooring wire diameter: | |
| 10.17 | Mooring wire breaking strength: | |
| 10.18 | Number of synthetic lines fitted on winch drums: | |
| 10.19 | Number of synthetic lines available on station: | |
| 10.20 | Synthetic line length: | |
| 10.21 | Synthetic line circumference: | |
| 10.22 | Synthetic line breaking strength: | |
| 10.23 | Does vessel fully comply with OCIMF "Recommendations for Equipment Employed in the Mooring of Ships at Single Point Moorings"? | |
| 10.23.1 | List exceptions, if any: | |
| 10.24 | Type of SPM mooring fitting installed: | |
| 10.24.1 | Number of SPM fittings: | |
| 10.24.2 | Holding capacity of SPM fittings: | |
| 10.25 | Bow chock dimensions: | |
| 10.26 | Are mooring chocks of the closed type? | |
| 10.26.1 | Universal (roller) type? | |
| 10.26.2 | Panama type? | |
| 10.27 | How many bitts forward of the manifold on the port side? | |
| 10.28 | If used, do synthetic mooring tails meet OCIMF Guidelines? | |
| 10.28.1 | Length of synthetic tails? | |
| 10.28.2 | Number of anti-chafing wire tails 11m in length with 1.8m eyes at the working end: | |
| 10.28.3 | Vessel has sufficient Mandal or Tonsberg shackles to connect synthetic tails to the mooring wires and wire anti-chafing tails to the synthetic tails: | |
| 10.29 | Distance from mid-point of cargo manifold to first spring line forward: | |
| 10.30 | Distance from mid-point of cargo manifold to first spring line aft: | |

| 10.31 | Does vessel have equipment to rig fire wires? | |
|---|---|---|
| 10.32 | Does vessel have emergency towing per SOLAS Reg. 15-1? | |
| 10.32.1 | If NO, when will it be installed? | |
| 10.33 | Is a towing bracket provided aft on upper deck? | |
| 10.34 | Are fender davits available on the portside fore and aft? | |
| 10.34.1 | Safe working load of davits: | |
| 10.35 | Anchor holding capacity: | |
| 10.36 | Anchor chain size: | |
| 10.37 | Anchor chain length: | |
| 10.38 | Number of messenger lines: | |
| 10.38.1 | Length of messenger lines: | |
| 10.38.2 | Diameter of messenger lines: | |
| 10.38.3 | Material of messenger lines: | |
| | **Section 11 — Navigation Equipment** | |
| 11.1 | Number of Radars: | |
| 11.2 | Number of gyro compasses: | |
| 11.3 | Is gyro error record book kept? | |
| 11.4 | Is a course recorder fitted? | |
| 11.5 | Is an ARPA installed? | |
| 11.6 | Are manual radar plotting facilities available? | |
| 11.7 | Is vessel equipped with a magnetic compass? | |
| 11.8 | Is the deviation card current and posted? | |
| 11.9 | Is a magnetic compass off-course alarm fitted? | |
| 11.10 | Is vessel equipped with GPS? | |
| 11.11 | Is GPS with speed indication and Cross Track Error (XTE) fitted? | |
| 11.12 | Is a Navtex receiver fitted? | |
| 11.13 | Is a satellite communication system installed? | |
| 11.14 | Number of UHF walkie-talkies: | |
| 11.15 | Is speed log installed? | |
| 11.16 | Two-axis Doppler speed log installed? | |
| 11.17 | Is a rate-of-turn indicator fitted? | |
| 11.17.1 | Are there bridge wing repeaters for the rate-of-turn indicator? | |
| 11.18 | Is a depth finder fitted? | |
| 11.18.1 | Does the depth finder have a recorder? | |
| 11.19 | Are RPM and Rudder Angle indicators fitted? | |
| 11.19.1 | Are RPM and Rudder Angle indicators fitted at the bridge wings? | |
| 11.20 | Is a "Bell" logger installed? | |

| 11.21 | Are there steering and engine controls on bridge wings? | |
| 11.22 | Is the vessel fitted with the following miscellaneous equipment: | |
| 11.22.1 | Computer with modem? | |
| 11.22.2 | Wind speed and direction indicator? | |
| 11.22.3 | Fax? | |
| 11.22.4 | Weather fax? | |
| 11.22.5 | Three cellular telephones? | |
| 11.23 | Is there an established system to ensure the vessel is provided with all necessary nautical publications and charts of suitable scales for the trades intended? | |
| 11.23.1 | Are records maintained to verify regular updating and correction of all nautical publications and navigation charts? | |
| 11.23.2 | Does the vessel receive regular Notices to Mariners appropriate to the trading areas? | |
| 11.23.3 | Is the Vessel fitted with a Bridge Event Recorder? | |
| **Section 12 — Oil Pollution Prevention** | | |
| 12.1 | Height of main deck fish plate (gutter bar) amidships: | |
| 12.1.1 | Aft: | |
| 12.1.2 | Transverse: | |
| 12.2 | Is there a deck dump-valve into the slop tanks? | |
| 12.2.1 | If yes, is a loop seal provided to contain pressure? | |
| 12.3 | Scupper plugs, type/material: | |
| 12.3.1 | If wood, are they cemented? | |
| 12.4 | Does vessel operate under an environmental policy covering wastes, garbage, sewage, noxious liquids/vapors and environmentally damaging substances? | |
| 12.5 | Is there adequate storage for readily available pollution control equipment: | |
| 12.6 | Do deck machinery, bunker manifolds and tank vents have fixed spill containment? | |
| 12.7 | Method of removing oil from enclosed area/containment: | |
| **Section 13 — Manuals/Logs/Training/Procedures** | | |
| 13.1 | Are the following manuals/logs available on board: | |
| 13.1.1 | Bridge Procedure Manual? | |
| 13.1.2 | Deck Log? | |
| 13.1.3 | Oil Record Books (Deck and Engine)? | |
| 13.1.4 | Fire Fighting Manual? | |
| 13.1.5 | Record of Cargo Piping Tests? | |

| 13.1.6 | Material Safety Data Sheets? | |
|---|---|---|
| 13.1.7 | International Safety Guide for Oil Tankers and Terminals (ISGOTT), latest edition? | |
| 13.1.8 | ICS/OCIMF: Ship to Ship Transfer Guide (Petroleum), latest edition? | |
| 13.1.9 | Manual with maximum loading rates, tank venting capacity, maximum tank pressure and vacuum for each tank? | |
| 13.1.10 | IMO: Safety of Life at Sea (SOLAS) latest consolidated edition | |
| 13.1.11 | IMO: Inert Gas Systems, latest edition? | |
| 13.1.12 | ICS: Guide to Helicopter/Ship Operations, latest edition | |
| 13.1.13 | ICS: Bridge Procedures Guide, latest edition | |
| 13.1.14 | IMO: Recommendations on Basic Principles and Operating Guidance Relating to Navigational Watchkeeping | |
| 13.1.15 | IMO: International Convention on Standards of Training, Certification, and Watchkeeping (STCW 1995), latest edition? | |
| 13.1.16 | IMO: International Regulations for Preventing Collisions at Sea, 1972, latest edition? | |
| 13.1.17 | IMO: Ships Routing, latest edition | |
| 13.1.18 | U.K. Dept. of Trade Merchant Shipping Notice No. M.854? | |
| 13.1.19 | IMO: MARPOL 73/78 Consolidated Edition (1991) including 1992 Amendments to Annex I and 1994-95 Amendments? | |
| 13.1.20 | Ship-specific Oil Transfer procedures (per U.S. Coast Guard requirements)? | |
| 13.1.21 | ICS/OCIMF: Prevention of Oil Spillages through Cargo Pump Room Sea Valves, latest edition? | |
| 13.1.22 | IMO: Crude Oil Washing Systems, latest edition | |
| 13.1.23 | ICS/OCIMF: Clean Seas Guide for Oil Tankers - Retention of Oil Residues On Board, latest edition? | |
| 13.1.24 | OCIMF: Mooring Equipment Guidelines, latest edition? | |
| 13.1.25 | OCIMF: Recommendations for Equipment Employed in the Mooring of Ships at Single Point Moorings, latest edition | |
| 13.1.26 | OCIMF: Effective Mooring, latest edition? | |
| 13.1.27 | OCIMF: Guidelines for the Control of Drugs and Alcohol On Board Ships, latest edition? | |
| 13.2 | Do all Deck Officers attend radar refresher training? | |

**B NO. 240 and M/V BARBARA E. BOUCHARD** Time Charter dated *[ March 27, 2019]*

| 13.2.1 | How often? | |
|---|---|---|
| 13.3 | List any special training possessed by officers (e.g., ship handling simulator courses, on board training, etc.) | |
| 13.4 | Other procedures established and available on board: | |
| 13.4.1 | Emergency response? | |
| 13.4.2 | Collision? | |
| 13.4.3 | Grounding? | |
| 13.4.4 | Oil spill? | |
| 13.4.5 | Fire? | |
| 13.4.6 | Tank Entry Permit Procedure? | |
| 13.4.7 | Is it required that the cargo tank and slop tank atmospheres be tested prior to loading or opening cargo tanks? | |
| 13.4.7.1 | Are results of these tests entered in a log? | |
| 13.4.8 | Mooring? | |
| 13.4.9 | Cargo handling? | |
| 13.4.10 | Maintenance and testing of equipment and systems? | |
| **Section 14 — Regulatory Requirements** | | |
| 14.1 | Does vessel fully comply with all applicable international conventions, laws, regulations and/or other requirements of the country of the vessel's registry and of the countries and/or ports and/or places to which the vessel may be ordered while in Charterer's service? | |
| 14.2 | Date of full compliance with the ISM Code for Operator: | |
| 14.3 | Date of full compliance with the ISM Code for Vessel: | |
| **Section 15 — Manning/Licensing** | | |
| 15.1 | Nationality and licenses of officers: | |
| 15.2 | Total Number of Deck Officers (Including Master): | |
| 15.3 | Total Number of Engineer Officers (Including Chief Engineer): | |
| 15.4 | Are Master and any Officer-in-Charge of cargo/bunker operations proficient in conversational English? | |
| 15.5 | Does the vessel operate under a Drug and Alcohol Policy that complies with ExxonMobil requirements? | |
| 15.6 | Do leave/rotation procedures include provisions for monitoring regular and relief crew competence and experience as well as controlling maximum hours worked and fatigue reduction steps? | |

**B NO. 240 and M/V BARBARA E. BOUCHARD** Time Charter dated *[ March 27, 2019]*

| 15.7 | Do all officers possess valid certificates/licenses appropriate to their rank and/or position on the vessel and the intended trade, including Dangerous Cargo Endorsements per STCW? | |
|---|---|---|
| | **Section 16 — Cargo Measurement and Sampling** | |
| 16.1 | Are vapor locks fitted? | |
| 16.2 | Are vapor locks calibrated for ullage measurement? | |
| 16.3 | Are vapor locks calibrated for innage measurement? | |
| 16.4 | Are vapor locks calibrated for wedge tables? | |
| 16.5 | Have the vapor lock calibrations been certified by a Classification Society or other recognized organization? | |
| 16.5.1 | If Yes, name of certifying body: | |
| 16.6 | Are sonic ullage tapes available? | |
| 16.6.1 | How many sonic ullage tapes are on board? | |
| 16.6.2 | Can sonic tapes measure ullage? | |
| 16.6.3 | Can sonic tapes measure temperature? | |
| 16.6.3 | Can sonic tapes measure oil/water interface layer? | |
| 16.7 | Are sampling devices available for use through vapor locks? | |
| 16.8 | Number of vapor lock sampling containers: | |
| 16.8.1 | Size of sample containers: | |
| 16.9 | Number of certified reference standard thermometers: | |
| 16.10 | Number of Explosimeters: | |
| 16.11 | Number of toxic gas detectors: | |
| 16.11.1 | Are they certified to detect $H_2S$ accurately in both air and inert gas environment? | |
| 16.12 | Do sounding pipes extend full depth of tanks? | |
| 16.13 | Are precautions against electrostatic ignitions (per ISGOTT) followed? | |
| | **Section 17 — Navigation** | |
| 17.1 | Owner warrants that it will maintain a navigation and bridge procedures policy/manual conforming to ICS/IMO STCW standards. | |
| | **Section 18 — Classification Society Surveys** | |
| 18.1 | Date of last dry-dock/repairs and shipyard name | |
| 18.2 | Was last special survey conducted under an Enhanced Survey Program? | |
| 18.3 | Date of last special survey: | |
| 18.4 | Are the following on board: | |

*B NO. 240 and M/V BARBARA E. BOUCHARD* Time Charter dated *[ March 27, 2019]*

| 18.4.1 | Survey Planning Document? | |
| 18.4.2 | Hull Structural Survey Report? | |
| 18.4.3 | Executive Hull Summary? | |
| 18.5 | Date of next special survey: | |

## Schedule B— Form of Parent Guaranty

1702 ## Guaranty

1703 In consideration of the sum of One U.S. Dollar and No Cents (US$ 1.00) and other good and valuable
1704 consideration, the receipt of which is hereby acknowledged, and in further consideration of *[insert*
1705 *Charterer name]* entering into a time charter of the M.T. *[insert vessel identification]* ("Charter") with
1706 the undersigned's affiliated company *[insert Owner name]*, we the undersigned, *[insert Parent*
1707 *Company name]* unconditionally and without requirement of any recourse against *[insert Owner*
1708 *name]* do hereby guarantee to *[insert Charterer name]* its successors and assigns full and complete
1709 performance by *[insert Owner name]* of all the terms and conditions of the Charter and full and
1710 complete payment of all indebtedness of *[insert Owner name]* to *[insert Charterer name]* under the
1711 Charter and, further, do hereby waive notice of default of *[insert Owner name]* under the Charter and
1712 notice of acceptance of the within Guaranty and unconditionally consent, without requirement of any
1713 notice to *[insert Parent Company name]*, to any modification of the Charter agreed to *[insert Charterer*
1714 *name]* and *[insert Owner name]* and to any extension of time that may be given by *[insert Charterer*
1715 *name]* to *[insert Owner name]* in respect of payment and/or any other performance under the Charter.

1716 The term "Charter" herein shall mean the Charter as it exists as of the date of its execution and as it
1717 may thereafter be changed by written addendum or addenda mutually executed by *[insert Charterer*
1718 *name]* and *[insert Owner name]*.

1719 The within Guaranty is not limited to any particular period of time but shall continue until all the terms
1720 and conditions of the Charter have been performed by *[insert Owner name]* or otherwise discharged
1721 in full.

1722 *[insert Charterer name]* may, but shall not be obligated to, bring any legal action or proceeding with
1723 respect to the within Guaranty in the Courts of the State of New York, USA, or in the Federal Courts
1724 situated therein and the undersigned hereby unconditionally and generally accepts in regard to such
1725 legal proceedings, for itself and in respect of its property, the jurisdiction and venue of the aforesaid
1726 Courts. The undersigned further consents and agrees that service of any process, necessary or
1727 helpful in connection with any legal action or proceeding as just described, may be made upon the
1728 undersigned by registered mail, postage prepaid, to the address shown below, which service of
1729 process shall be as fully effective in all respects as service upon the undersigned lawfully made within
1730 the State of New York. The foregoing shall be without prejudice to any service of process that might
1731 otherwise be allowed by relevant law.

1732 Company: *[insert Parent Company name]*

1733 Address: *[insert Parent Company address]*

1734 IN WITNESS WHEREOF, *[insert Parent Company name]* of *[insert Parent Company domicile]* has
1735 caused this Guaranty to be executed by its duly authorized representative this _____ day of
1736 _____, 20__ and attested in the City of _____ State of _____.

1737 By: _____

1738 Name: _____

1739 Title: _____

1740 Attest: _____

1741

## Schedule C —— TMSA Element Levels

| Element | Stage |
|---|---|
| 1: Management, leadership and accountability | 3 |
| 1A: Management, leadership and accountability | 3 |
| 2: Recruitment and management of shore-based personnel | 2 |
| 3: Recruitment and management of vessel personnel | 2 |
| 3A: Recruitment and management of vessel personnel | 2 |
| 4: Reliability and maintenance standards | 2 |
| 4A: Reliability and maintenance standards (critical equipment) | 2 |
| 4B: Reliability and maintenance standards (close-out performance) | 2 |
| 5: Navigational safety | 3 |
| 6: Cargo and ballast operations | 2 |
| 6A: Mooring operations | 3 |
| 7: Management of change | 2 |
| 7A: Management of change | 2 |
| 8: Incident investigation and analysis | 2 |
| 8A: Incident investigation and analysis — training | 2 |
| 9: Safety management — shore-based monitoring | 2 |
| 9A: Safety management — fleet monitoring | 2 |
| 10: Environmental management | 2 |
| 10A: Environmental management | 2 |
| 11: Emergency preparedness and contingency planning | 2 |
| 11A: Emergency preparedness and contingency planning | 2 |
| 12: Measurement, analysis and improvement | 2 |
| 12A: Measurement, analysis and improvement | 2 |

Initials for Owner: _____        Initials for Charterer: _____

*B NO. 240 and M/V BARBARA E. BOUCHARD* Time Charter dated *[ March 27, 2019]*